## UNITED STATES v. SEAGREN.
### No. 5320.

Court of Appeals of District of Columbia.
Argued April 7, 1931.
Decided May 4, 1931.

Henry H. Glassie, Alex H. Bell, Jr., and Arthur G. Lambert, all of Washington, D. C., for the United States.

G. E. Sullivan, Paul B. Cromelin, Bolitha J. Laws and Francis C. Brooke, all of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

HITZ, Associate Justice.

This is an appeal from a decree of the Supreme Court of the District of Columbia in a condemnation proceeding brought under the Act of Congress of January 5, 1927 (44 Stat. 931) for the relocation of the Botanic Garden in the city of Washington.

The act authorizes the taking of "all of the

privately owned land, buildings and other structures" in square numbered 576 and 578.

The appeal concerns a portion of parcel VII in the condemnation proceedings, described as lots 808, 809, 810, 811, and 812 in square 576.

At the time the proceedings were instituted, and long prior thereto, these lots were owned by the Saegmuller family, but leased to Seagren, appellee here, and hereafter referred to as the tenant, who built and conducted thereon a gasoline filling station on a large scale, with the usual equipment of such an establishment, consisting mainly of two small fireproof houses; a work shop; divers tanks for gasoline and oil three feet underground, with the pipes, pumps, and other paraphernalia for operation, the property being covered with a concrete surface or roadway and inclosed by an iron fence five feet in height.

Seagren's first lease for any portion of the land in question was for lot 812, described as a "vacant lot," leased for one year from July 1, 1919, at a rental of $30 per month, with option of renewal for another year at the same rent, if the property should not have been sold in the meantime, and provided that, in the event of a sale of the land during the second year, the tenant would give possession on sixty days' notice.

This lease gave the tenant authority to erect buildings, implant tanks, and other structures, and "to take away and remove the said buildings and other structures" within thirty days from the termination of the lease.

By subsequent leases and renewals the tenant took over other lots on increasing rentals, so that, when the condemnation occurred, in August, 1930, he had possession of lots 808 to 812, inclusive, for which he was paying a monthly rental of $305, always reserving the right to remove all structures placed upon the land by him at the termination of his tenancy.

Before this time, however, a controversy had arisen between the landlord and tenant, the latter asserting a right of renewal for a further term of five years upon a reasonable rental to be determined by the parties, the landlord denying any right of renewal, and asserting the tenant to be holding over by sufferance after the expiration of all his leases.

This controversy is pending in the court of equity upon a bill of complaint filed by the tenant, but apparently has never been decided.

In the condemnation proceedings, the tenant made no claim in respect of any unexpired term, on the theory that, since his obligation was to pay a reasonable rental which had never been fixed, there was no ascertainable value in his term over the obligations of his lease, in view of the imminent taking of the property by the United States.

But he did assert a right to the reasonable value of his structures upon and within the land taken, the United States contesting such claim on the ground that the tenant's right of removal, reserved in the lease as against the landlord, precluded his recovery in condemnation as against the United States.

The landlord disclaiming any right or interest in the tenant's structures, the issue was considered and decided by the court as between the United States and the tenant.

The commissioners of appraisal, as between the government and the landlord, appraised the landlord's interest in parcel VII at $320,040, which included $48,050 as "the extent to which the present use of the land as a gasoline station enhances the value thereof."

As between the United States and the tenant, the commissioners found the present value of his structures to be $35,000, subject to the opinion of the court as to his legal right, this sum to be in addition to the allowance to the landlord.

This verdict being approved and ratified by the court, the United States took this appeal against the landlord in respect of the allowance of $48,050 for enhanced value because of the licensed use of the land as a gasoline station; and against the tenant in respect of the allowance of $35,000 for his structures.

The appeal against the landlord was compromised and dismissed by the United States, thus leaving for decision here only the question of the tenant's allowance.

On this question the evidence tended to show an outlay by the tenant of $60,000 upon the structures and equipment of his establishment, the commissioners allowing $35,000 as the present value thereof.

No question is made here on the arithmetic, the United States apparently conceding the values, and that the structures were of a character by their nature to become part of the realty, except for the provisions of the leases giving the tenant the ultimate right of removal against the landlord upon the termination of the lease.

The question thus becomes whether or not

this private stipulation for removal between the landlord and the tenant inures to the benefit of the government when condemning the estates of both? Can the United States, exercising its right of eminent domain, change the essential character of structures from realty, which it must pay for, to personalty, which it may order removed without payment, because a landlord and tenant, dealing upon private considerations of reciprocal interest and expenditure, have years before agreed as between themselves that upon their termination of their lease the tenant might remove his structures?

In support of its contention the United States mainly relies on the decision of the Supreme Court in Boston Chamber of Commerce v. Boston, 217 U. S. 189, 30 S. Ct. 459, 460, 54 L. Ed. 725, but the facts in that case differ so substantially from the facts here that we do not regard that decision as controlling this.

In the Boston Case the city condemned for use as a public street a parcel of land owned in fee by the Chamber of Commerce, but over which an abutting owner had an easement of way, light, and air. The owners of the dominant and servient estates, together with a mortgagee, being all the parties having any interest in the land, agreed among themselves by stipulation filed in the cause that the property should be appraised in condemnation as an' unrestricted fee, and paid for accordingly by one lump sum.

The city contended that the land and the titles must be taken as they actually stood, and not as stipulated by the parties in interest, that the servient estate must be valued as diminished by the servitude. and that the dominant estate could not be substantially injured by adding a public easement for way, light, and air, over property already subject to the private easement for the same purposes.

In upholding the contentions of the city, the court rejected the agreement of the parties as creating a fictitious title that no one owned, and a theoretical loss that no one suffered.

The court thereupon dealt with the property, and the interests therein, as they actually stood, and not as the agreement provided they might be taken to stand.

The court there stated that the constitutional provision controlling the right of eminent domain "merely requires that an owner of property taken should be paid for what is taken from him. It deals with persons, not with tracts of land. And the question is, What has the owner lost? not, What has the taker gained?"

So, in this case, we are not dealing merely with a tract of land, but with the persons holding interests therein, and the verdict as confirmed allows to the landlord and to the tenant the appraised value of each estate.

And so the agreement for removal made by these parties at another time, for another purpose, and affecting no interests but their own, must be rejected here as irrelevant, when set up by the United States to control its condemnation proceedings against the tenant's interest in the land.

But applying the general language of the Boston Case as quoted above to the present controversy, the United States contends that the tenant here has lost nothing by the taking of the property.

He reserved the right to remove his structures whenever the landlord should terminate his tenancy; now that the United States has terminated his tenancy by taking the land, he may exercise his right and remove his structures.

Nothing has been taken from him. Only his performance of an inevitable obligation has been accelerated.

But much the same argument could be made in support of murder, for all that any murderer ever did was to accelerate the debt that every mortal owes to nature.

If the structures here in question had been built by the landlord, they would have been taken and paid for by the government without question, as the government concedes they are now part of the realty. Is the tenant's reserved power of removal as against the landlord's termination of the lease to work a forfeiture in favor of the government? We think not.

The inherent character of these structures is real estate; no agreement can change that character, though the landlord may waive the right which might otherwise accrue to him from the character of the structures placed upon his land. At the most, that is all that this agreement did.

We find the controlling rule well stated in Nichols on Eminent Domain: "It frequently happens that, in the case of a lease for a long term of years, the tenant erects buildings upon the leased land or puts fixtures into the building for his own use. It is well settled that, even if the buildings or fixtures are attached to the real estate and would pass

with a conveyance of the land, as between landlord and tenant they remain personal property, and, in the absence of special agreement to the contrary, may be removed by the tenant at any time during the continuation of the lease provided such removal may be made without injury to the freehold. This rule is however entirely for the protection of the tenant and cannot be invoked by the condemning party. If the buildings or fixtures are attached to the real estate, they must be treated as real estate in determining the total award, but in apportioning the award they are treated as personal property and credited to the tenant." Nichols on Eminent Domain (2d Ed.) vol. 1, § 234.

And the New York courts have frequently considered the question, and stated the rule very precisely:

"As the property now exists, it is real property, and so remains until the structure is severed from the soil. This act the tenant is not bound to perform at the time the property is taken. As it then is, so it may always remain; and, when the city makes the compensation for the property, it steps into all the rights possessed by both parties. * * *

"No reported case in this state is called to our attention, and none found after diligent search, where the right of the tenant to receive compensation for permanent improvements made by him upon leased land, taken by right of eminent domain, has been denied." In re Appointment of Park Commissioners (Super. Buff.) 1 N. Y. S. 763 at page 766, 767; In re Post Office Site (C. C. A.) 210 F. 832; Matter of the City of New York, 118 App. Div. 865, 103 N. Y. S. 908; In re Mayor, 39 App. Div. 589, 57 N. Y. S. 657.

"The city took the entire buildings as they stood, including the trade fixtures therein, and for the purposes of this proceeding they must all be regarded as real property; that is, as between the tenant and the city, the trade fixtures were real property * * * and the tenant was under no more obligation to remove them than he would be to remove a building if he were the owner. As between the tenant and the owner, however, the trade fixtures were personalty, and could be removed, and therefore any award made for them would go to the tenant." In re Block Bounded by Avenue A, etc., 66 Misc. Rep. 488, 122 N. Y. S. 321, 339.

We find no error in the record, and the decree is affirmed.

Affirmed.