## BRAZOS RIVER CONSERVATION AND RECLAMATION DISTRICT v. AD-KISSON.

### No. 2348.

Court of Civil Appeals of Texas. Eastland.

June 11, 1943.

Rehearing Denied July 16, 1943.

T. T. Bouldin, of Mineral Wells, and Sidney Samuels, of Fort Worth, for appellant.

Ritchie & Ritchie and J. R. Creighton, all of Mineral Wells, for appellee.

LESLIE, Chief Justice.

In this suit the Brazos River Conservation and Reclamation District sought and obtained by cross action condemnation of an easement in an oil and gas leasehold estate owned by Albert Adkisson. In addition, the judgment awarded Adkisson damages, and the District appeals. The proceeding is based on Art. 3269, R. S. 1925, Vernon's Ann.Civ.St. art. 3269, and is one branch of the litigation growing out of the case of Brazos River Conservation and Reclamation District v. E. P. Costello et al., 135 Tex. 307, 143 S.W.2d 577; 130 A.L.R. 1220.

The cause was tried before the Court without a jury. No request was made for findings of fact and conclusions of law. (All italics herein ours.)

From different angles appellant's first eight points raise the same controlling question presented by this appeal, and aptly stated by appellee as follows: "Did the Court properly require the District to pay appellee for the property taken, including casing and other fixtures affixed to the leasehold estate, where the lease, producing wells, and such equipment were inundated by the waters of the District's reservoir, even though as between the Appellee as Lessee and the original landowners as Lessors, Appellee had the privilege

of removing such fixtures at the termination of the lease?"

On reason and authority we think this question must be answered in the affirmative.

The lease was a producing oil and gas lease embracing approximately 487 acres, and about 413.22 acres thereof were flooded by the reservoir, including 12 producing oil wells, casing, pumping unit, engines, and other such property and fixtures used by Adkisson in the operation of said lease as a unit or as a going concern, all of which was alleged to have been destroyed and rendered useless by the waters of the reservoir.

The Court's decree is in part as follows:

"The court further finds that certain fixtures located upon the lease-hold estates of Respondent on the above property have been covered and flooded by the waters of Petitioner's Reservoir; and that the condemnation of an easement on said property has resulted in Respondent's use thereof being totally destroyed and has resulted in a taking thereof by Petitioner.

"It is further ordered, adjudged, and decreed by the court that the Brazos River Conservation and Reclamation District do have and recover of and from the said Albert Adkisson full title in and to the hereinafter described property which is located on the above described land and flooded and covered by the waters of said reservoir:  *  *  *

"It further appears from the evidence and the court finds that the Respondent Adkisson has been damaged by the condemnation of the easement hereinabove mentioned, and the taking and destruction of his leasehold estates, and the fixtures thereon  *  *  *."

The judgment then identifies the equipment or fixtures so located and in the actual use on the leasehold. In other words, the trial court adjudged the casing and tubing in the producing oil wells, the engines, power house, tanks, flow lines, etc. so used in effecting production to be *fixtures,* and so treated them in his judgment awarding damages generally for the property rights condemned. The Court considered the fixtures as enhancing the value of appellee's property and not as separate items of recovery.

(As originally drawn, the trial court's judgment, after itemizing or enumerating said fixtures, contained an additional provision as follows: "Any and all other personal property in, on and under the above described real property, which is owned or claimed by the said Albert Adkisson." This provision of the original draft of the judgment will be disregarded in this opinion, since, as evidenced by supplemental transcript, the trial court held it was no part of said judgment and its inclusion therein a clerical error which was eliminated by proper order. This correction renders it unnecessary to resort to rules employed in construing judgments.)

In seeking condemnation of various lands in the area, the District included Adkisson's leasehold estate and in substance defined the issues by pleadings, as follows: "Your Petitioner further represents that it is necessary in order to make effective the purposes for which the District was created that Petitioner acquire, take, hold and enjoy *all the properties, property rights, rights and privileges* of the said Respondent herein, in and to said lands and that an easement to said land and property rights be condemned."

Such allegations possibly amount to no more than emphasis of the object and general purpose of the proceeding, but they also reflect the scope and effect which the proceeding had upon said fixtures.

In response to such pleadings appellee Adkisson alleged that in the Costello and Carter lands he owned a certain oil and gas lease and that 413.22 acres were flooded and covered by the reservoir, including 12 producing oil wells, casing, pumping units, etc. and fixtures used by him in the operation of said lease as a unit; that all of same had been covered, destroyed or rendered valueless to him, to his damage, etc.

The factual background of Appellee's contentions reflected by the testimony generally, and especially that of Montgomery is, in substance, as follows:

Said witness testified he was familiar with the fixtures on said leases and made an inventory of the same at the time or immediately before appellee's property was taken or covered by water from the dam. That all such fixtures or equipment were used by Adkisson in the production of oil. That the power house, etc., was 1,800 to 2,500 feet from the shore out in the lake, and about 30 feet under water. That the casing in some of the wells was cemented, and all wells had casings; that tubing, rods, pump, flow lines, and well head fittings were all connected to the casing.

27

That the flow tanks were connected with the flow lines. That the tanks were of steel, of 100 to 250 barrel capacity, some welded, some put together with bolts, and resting on heavy timber foundations. That on the lease in an iron house there was a central power and an 18 foot band wheel power on a concrete foundation, with which appellee pumped eight of the wells. That this power was connected by pull rod lines, with pump jacks on the wells; that the pump jack sat over the well and lifted the sucker rods in the tubing and pumped the oil. That the sucker rods ran down through the tubing and connected with working slides. That the pump jacks were on timber foundations about 8x10 in size. The testimony gives in detail the operations and mechanics employed in producing oil wells.

The District's contentions with reference to these fixtures is reflected by a discussion between its counsel and the trial court. That discussion will, in part, be set out, since it focuses attention on the theory advanced in the trial, as well as the material questions presented by this appeal.

"Mr. Kilgore: Now, your Honor, we object to any testimony with reference to the fixtures or the equipment, because this is a proceeding to condemn an easement and is not a proceeding to take over the fixtures and equipment he might have had, and, therefore, it is wholly irrelevant as to what fixtures or equipment was on the property; and they are still there unless he removed them, which he had the right to do.

"Court: Do you have any authorities?

"Mr. Kilgore: I think it's elementary when we seek only to condemn an easement, the right to inundate a piece of property only; there are means by which they could still save his equipment.

"Court: They would now be under water, wouldn't they?

"Mr. Kilgore: I did not say they would not be under water."

In the judgment the Court found as follows: "The Court further finds that certain fixtures located under the leasehold estates of Respondent of the above property have been covered and flooded by the waters of Petitioner's Reservoir; and that the condemnation of an easement on said property has resulted in Respondent's use thereof, being totally destroyed and has resulted in a taking thereof by Petitioner."

The appellant insists the trial court erred in the judgment (1) "in mingling indistinguishably the value of the equipment on the lease with the value of the mineral estate which had been submerged by the waters of the District", (2) by fusing the value of the equipment on the lease with the value of the mineral estate", (3) "The mechanical equipment * * * on the mineral estate of Adkisson were not fixtures in the sense that such fixtures become a part of the realty, but were trade-fixtures, and, therefore, could not be estimated as a separate element of damage against the District", and (4) "If the equipment on the mineral lease that had been utilized by Adkisson in drilling for oil and gas and in extracting oil and gas from the soil should be considered as fixtures so that such fixtures became a part of the realty, then such fixtures would belong to the owner of the soil (Costello and Carter) and not to Adkisson, and consequently could not be an element of damage or of value in the condemnation suit of the District." Four propositions following those above stated raise, in substance, the same question.

On the other hand, appellee Adkisson contends that the testimony of Montgomery and other witnesses conclusively shows that the equipment on the lease listed by Montgomery was affixed to the leasehold estate and constituted fixtures, and that the trial court specifically so found and awarded judgment for condemnation and taking of said easement in the leasehold and fixtures thereon as a unit; that is, the Court considered the fixtures as affecting or enhancing appellee's damages for the easement condemned and did not consider any other property or items except those specifically in Montgomery's inventory.

This contention of appellee is well supported by the testimony, and it limits the inquiry to the controlling question stated in the outset.

As we interpret the record, it is not accurate to refer to said equipment in the manner installed and as being used merely as "drilling equipment" that might be found in a supply house or elsewhere, nor to refer to the same as "portable property used by an oil driller in search of oil and gas", although such use could have been made of the same. In other words, the equipment enumerated by Montgomery must be viewed in the light of its actual use or attachment at the time in the production

of oil from a developed lease which the Appellee was obligated to keep producing in order to keep the lease alive under the terms thereof. Watson v. Rochmill, 137 Tex. 565, 155 S.W.2d 783, 137 A.L.R. 1032.

Obviously the fixtures under consideration might have remained in place over a period of many years, or during the life of the active lease, the length of which could not be definitely determined; and the voluntary cessation of production by appellee would have forfeited his lease estate, since the primary term of the lease had expired and the lessee's primary function thereunder was to produce oil. The maintenance of the casing and the connected operating equipment in the wells and the power for pumping the wells and producing oil was vital to the continuation of the lessee's estate.

■ In answering the questions presented by this appeal, it is necessary to recognize that an oil and gas lease is a determinable fee, and since it is a fee, it could continue forever. As stated in 31 T. J. p. 596, § 46 et seq., and the numerous authorities cited therein, "It is now a well settled rule of property in Texas that the estate therein acquired by the lessee is a determinable or defeasible fee—that is, a fee simple estate which is subject to one or more special limitations." Texas Co. v. Daugherty, 107 Tex. 226, 176 S.W. 717, L.R.A. 1917F, 989; Sheffield v. Hogg, 124 Tex. 290, 77 S.W.2d 1021, 80 S.W.2d 741; Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S.W. 290, 29 A.L.R. 566; W. T. Waggoner Estate v. Sigler Oil Co., Tex.Com.App., 284 S.W. 921, reversing Tex.Civ.App., 276 S.W. 936; but set aside on other points 118 Tex. 509, 19 S.W.2d 27; Mon-Tex Oil Corporation v. Potest, 118 Tex. 546, 19 S.W.2d 32, reversing Tex.Civ.App., 13 S.W.2d 211; Hogg v. Magnolia Petroleum Co., Tex. Com.App., 267 S.W. 482, reversing Tex. Civ.App., 254 S.W. 580; 7 T.L.R. p. 9 (Judge Walker); Summers on Oil & Gas, Perm.Ed., Vol. 4, p. 2, § 652.

■ In said text it is stated: "An oil and gas lease carries with it the right to possession of the surface to the extent reasonably necessary to enable the lessee to perform the obligations imposed upon him by the lease."

■ As to the nature of the casing and pumping equipment, the same text, based on an abundance of authorities, says: "It is a well-settled rule that casing in wells, derricks, engines, and other machinery and appliances placed upon the land by the lessee for testing, developing and operating the land for oil and gas purposes are trade fixtures. They may, therefore, be removed at any time during the existence of the lease, or within a reasonable time after its termination. If they are not so removed, they become the property of the landowner." Summers on Oil & Gas, Perm. Ed., Vol. 3, p. 214, § 526.

■ The last sentence of that quotation is significant in that if such fixtures do not by attachment to the soil become a part of or partake of the nature of the freehold, then they would not become the property of the landowner.

According to the opinion in Texas Co. v. Daugherty, 107 Tex. 226, 176 S.W. 717, 718, L.R.A. 1917F, 989, appellee Adkisson not only owned the minerals conveyed him by the lease, but the possession of the surface, insofar as necessary for the purpose of producing oil. That opinion so holds in this language: "For the purpose of making the exploration and producing all the oil, gas, and other minerals that might be within the ground, and the erection of all structures necessary thereto, as well as their storing and transportation, the possession of the land itself is likewise granted, with no limitation upon the number of wells or shafts that the grantee might sink, or the extent of its operations in that connection, and consequently no qualification of its right of possession to all such parts of the surface * * * as might be necessary to its full use by the grantee for the purposes named."

As applied to the facts of the instant case, it cannot be denied that if Costello, the owner of one tract, had drilled the wells himself and had put casing in them, the casing would have become a part of the freehold and would pass to the purchaser of the land from him. The same is true of the other items affixed to the soil and the wells, rendering the lease a live and producing unit. 10 R.C.L., p. 143, § 125.

True, the ownership of such equipment and rights thereto as between the lessor (landowner) and the lessee is generally fixed by the stipulations in the lease protecting same as personal property of the lessee with right to remove within reasonable time after expiration of the lease, etc.

31 T. J. p. 924, § 24 et seq. However, the controversy presented by the instant suit is one between a third party, the District, whose condemnation rights have destroyed the appellee's property in a leasehold estate which he could not keep in existence without active operation which necessitated retention of the fixtures on the ground and did not permit their removal. Watson v. Rochmill, 137 Tex. 565, 155 S.W.2d 783, 137 A.L.R. 1032.

The law applicable in condemnation proceedings, where such fixtures are involved is stated in 10 R.C.L. p. 143, par. 125, as follows: "Where fixtures are of such a character that if put in by the owner, they would constitute a part of the real estate, *they must be paid for as real estate by the party condemning the land."*

Stated somewhat differently, Lewis on Eminent Domain, 3rd Ed., Vol. 2, p. 1276, says: "Fixtures upon the property taken must be valued and paid for as a part of the real estate. and any depreciation in the value of fixtures upon the part not taken is to be taken into consideration the same as damages to the soil." See 20 C. J., p. 799, 29 C.J.S., Eminent Domain, § 175.

Regardless of the legal nomenclature employed in stating the rules and reason affording just compensation in condemnation suits, the authorities are generally in accord that what must be paid for in condemnation proceeding, is determined by viewing the condemnor as a purchaser, and the condemnee as a seller. That is, if the appellee sold his leasehold estate in the ordinary course, would the casing in the well, and pumping equipment go with the sale?

There is logic in appellee's reply to a hypothetical question, wherein he says: "We can answer this by observing that (the primary term having expired) if the casing etc. did not go with a sale, but was pulled and retained by the Seller, there would be no production and no lease —and, therefore, no sale!"

This announces a correct legal conclusion according to Watson v. Rochmill, 137 Tex. 565, 155 S.W.2d 783, 784, 137 A.L.R. 1032, which says: "It appears to be very well settled that under the terms of the lease, upon cessation of production after termination of the primary term, the lease automatically terminated. W. T. Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27."

The above test of rights as between seller and purchaser is explained and approved in an opinion by Judge Alexander in State v. Miller, Tex.Civ.App., 92 S.W.2d 1073, 1074. There the State, undertaking to condemn land for highway purposes, took the position that a building on the desired strip should be moved by the owner to another portion of his land (not being condemned), and that the State should be required to pay for no more than the bare land taken plus the cost of moving the improvements. Such theory was rejected by the court, which in part held as follows:

"Such a rule would be intolerable. The law will not sanction such unnecessary meddling with a citizen's rights. Ordinarily in condemnation cases in determining what improvements pass with the title to the condemned land, the same rule applies as that which governs between an ordinary vendor and vendee. The building here under consideration was a permanent improvement and constituted an appurtenance to the land which would pass with the title in an ordinary conveyance, and in our opinion the state should be required, as held by the trial court, to accept and pay for it along with the land so condemned." (Citing numerous authorities.)

Such authorities illustrate the rule which obtains, not between a lessor and a lessee, whose rights are usually determined by the lease, but when a third party, the State in that case and the District in the instant one, steps in and condemns the property rights of the lessee.

The opinion in the Miller case cites United States v. Seagren, 60 App.D.C. 183, 50 F.2d 333, 335, 75 A.L.R. 1491, which is very similar to the instant case. There the lessee held a long term lease on property on which he had erected a filling station and installed underground tanks, pumps, piping, etc. The lease, as in this case, provided the fixtures could be removed at termination of lease. The holding made in that condemnation proceeding is as follows:

"And so the agreement for removal made by these parties at another time, for another purpose, and affecting no interests but their own, must be rejected here as irrelevant, when set up by the United States to control its condemnation proceedings against the tenant's interest in the land.

"But applying the general language of the Boston Case [Boston Chamber of Com-

merce v. City of Boston, 217 U.S. 189, 30 S.Ct. 459, 54 L.Ed. 725] as quoted above to the present controversy, the United States contends that the tenant here has lost nothing by the taking of the property.

"He reserved the right to remove his structures whenever the landlord should terminate his tenancy; now that the United States has terminated his tenancy by taking the land, he may exercise his right and remove his structures.

"Nothing has been taken from him. Only his performance of an inevitable obligation has been accelerated.

"But much the same argument could be made in support of murder, for all that any murderer ever did was to accelerate the debt that every mortal owes to nature.

"If the structures here in question had been built by the landlord, they would have been taken and paid for by the government without question, as the government concedes they are now part of the realty. Is the tenant's reserved power of removal as against the landlord's termination of the lease to work a forfeiture in favor of the government? We think not.

"The inherent character of these structures is real estate; no agreement can change that character, though the landlord may waive the right which might otherwise accrue to him from the character of the structures placed upon his land. At the most, that is all that this agreement did."

Annotations (75 A.L.R. 1495) following the Seagren case analyzes that authority as follows: "Without question the tenant in the reported case * * * would have suffered a pecuniary loss if he had been compelled to protect his ownership of the filling station equipment, consisting of divers tanks, pipes, pumps, and other paraphernalia, by removing the same from the premises and making what use he could of the equipment on other premises. Even though he might ultimately have had to vacate and salvage what equipment he could from the station, it was to his advantage to maintain his property in the condition in which it was installed so long as he had a right to occupy the premises. The rule of the reported case (United States v. Seagren), that an agreement between landlord and tenant that the tenant shall have the right to remove improvements placed upon the premises by him shall not inure to the benefit of the condemner, is supported by considerable authority."

For other authorities applying the rule under similar facts, see: In re Postoffice Site, etc., 2 Cir., 210 F. 832; Jackson v. State, 213 N.Y. 34, 106 N.E. 758, L.R.A. 1915D, 492, Ann.Cas.1916C, 779; In re: Block Bounded by Ave. A, Etc., 66 Misc. 488, 122 N.Y.S. 321; In re North River Water Front, Etc., 118 App.Div. 865, 103 N.Y.S. 908; In re City of New York (In re Water Front in City of New York), 189 N.Y. 508, 81 N.E. 1162; In re East River Drive, Etc., 159 Misc. 741, 289 N.Y.S. 433; Dept. of Pub. Works v. McBride, 338 Ill. 347, 170 N.E. 295; Mayor, etc., of Baltimore v. Himmel, 135 Md. 65, 107 A. 522.

In Jackson v. State, 213 N.Y. 34, 106 N.E. 758, L.R.A.1915D, 492, Ann.Cas.1916 C, 779, it is said in an opinion by Justice Cardozo in a condemnation suit: "We think that the power of the state is not so great, nor the plight of the citizen so helpless. 'Condemnation' is an enforced sale, and the state stands toward the owner as buyer toward seller. On that basis the rights and duties of each must be determined. It is intolerable that the state, after condemning a factory or warehouse, should surrender to the owner a stock of secondhand machinery and in so doing discharge the full measure of its duty. Severed from the building, such machinery commands only the prices of secondhand articles; attached to a going plant, it may produce an enhancement of value as great as it did when new. The law gives no sanction to so obvious an injustice as would result if the owner were held to forfeit all these elements of value."

It follows that if the foregoing conclusions are correct and the cited authorities sound, the condemnor must pay for the fixtures along with and as part of the underlying land or minerals of said leasehold estate destroyed or rendered valueless, and it is unnecessary to discuss appellant's contention that it was the duty of the appellee to bring a separate suit for damages and recover the value of the fixtures flooded or destroyed. Evidently the fixtures in question go with the taking of the lease or the part destroyed.

There is no merit in the appellant's further contention or suggestions that Adkisson was under the duty to pull the casing, etc., from the wells, and that he had ample time in which to plug them and avoid the effects of the water from the lake submerging same. Adkisson had nothing but a determinable fee. The pri-

mary term of the lease had expired and Adkisson's title to the leasehold estate and property rights therein depended upon the continuation of production. He did not dare do what appellant suggests with forfeiture staring him in the face. Watson v. Rockhill, supra. The law imposed no such duty or hazard under the lessee under the circumstances.

The trial court was correct in considering said fixtures as adding to and enhancing the value of Adkisson's property condemned and in refusing to consider same as separate items of recovery.

As the case was tried, no question of double recovery is presented when tested by such authority as State v. Carpenter, 126 Tex. 604, 619, 89 S.W.2d 194, 979, and cases therein cited. In Parker County v. Jackson, 5 Tex.Civ.App. 36, 23 S.W. 924, it was in substance held that the value of such improvements may be admitted for the purpose of determining the market or intrinsic value of the land itself, and augmenting such value, but not as a separate or distinct recovery.

In considering the above and other issues of fact presented by this record, we must presume the trial court refrained from giving effect to inadmissible testimony, if any. As stated, there are no findings of fact or conclusions of law, and neither is there a certificate showing the judge considered any inadmissible testimony in arriving at his judgment.

Under the authorities we do not believe that the rules of law applicable to the condemnation of an easement in a leasehold estate differ in principle from the rules applicable to the condemnation of a fee or interest owned by the lessor. As a practical matter it was in no respect feasible for Adkisson to drill in the water and produce oil. The use and value of his property was destroyed, as in the case of United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 357, 47 L.Ed. 539, where the court, in disposing of a case where land was flooded by a dam, says:

"It is clear from these authorities that where the government by the construction of a dam or other public works so floods lands belonging to an individual as to substantially destroy their value there is a taking within the scope of the 5th Amendment. While the government does not directly proceed to appropriate the title, yet it takes away the use and value; when that is done, it is of little consequence in whom the fee may be vested."

In Cumbaa v. Town of Geneva, 235 Ala. 423, 179 So. 227, the condemnor in building a levy, undertook to raise the improvements onto the levy and require the owner to use them. The opinion held:

"The law is for practical purposes and looks to practical ends, and * * * in the ordinary case of an application to condemn an easement, not limited to a term of years, the rule is to award to the owner the value of the entire fee at the time of the taking. * * *

"The town cannot avoid these consequences by a preservation of the buildings and raising them to the level of the levee, and, as thus elevated, thrust their involuntary ownership upon [Appellants]."

In the instant case the District has not acted with the same generosity by preserving the fixtures and thus thrusting them upon the owner, but has permanently submerged them in water and, in effect, suggested to Adkisson that he recover them.

What has been said in effect overrules appellant's first eight points and does so by the application of correct rules of law to the facts of a *condemnation* case.

As stated, the instant case is not one dealing with the status of oilfield casing, equipment, or rights therein as between a lessor and lessee, or persons asserting mechanic's or chattel mortgage liens therein. Illustrative of such cases are Moore v. Carey Bros. Oil Co., Tex.Com.App., 269 S.W. 75, 39 A.L.R. 1247; Wagner Supply Co. v. Bateman, 118 Tex. 498, 18 S.W.2d 1052; Armstrong v. Federal Supply Co.; Tex.Civ.App., 17 S.W.2d 170, etc., but these are not condemnation suits, as in the instant case, where a third party, or outsider, seeks to impress an easement on a leasehold, the effect of which works the destruction, or substantial destruction, of the same. However, the principles applied in the type of cases just mentioned in no way clash with the proper application of the rules and authorities herein cited in support of this court's conclusion.

The trial court awarded Appellee as part of his damages interest on the property taken from him at the legal rate from October 30, 1940 (when taken by the District), until June 13, 1942 (the date of the judgment). The interest amounted to $8,550.

After that date—October 30, 1940—and before, or while water was accumulating in the reservoir, the appellee Adkisson continued (as found by the trial court) "with the consent of the District" to produce some oil, the net value of which was $4,479.83. The court credited this amount on the $8,550 interest awarded appellee and entered that credit as ·of June 13, 1942, the date of the judgment. The appellant now contends the trial court erred in not allowing the interest on the proceeds of oil sales (evidenced by the $4,479.83), made by Adkisson and retained by him, after the taking by the District had occurred. That appellee was allowed to retain such interest on the proceeds of said oil sales.

The amount of each of said oil runs is not made to appear in the record, nor the respective dates they were collected by Adkisson. In its brief the appellant says: "The District was entitled to 6% interest on the oil runs *as they were received* by Albert Adkisson, and said amount of interest should be deducted from the judgment rendered in said cause. The exact amount of this interest the Appellant does not know, for the reason that the dates that these various oil payments accrued are not known to Appellant, and, therefore, Appellant cannot determine the exact amount of interest that should be deducted from the judgment."

Obviously if this record is so void of testimony or information that appellant is unable to estimate the amount of said interest claimed, certainly this court is in no position to reform or correct the judgment for such an alleged error. The burden was upon the appellant to show the date of the collection or accrual of said amounts in the hands of the appellee, and it has failed to do so, and the trial court evidently had no other alternative than to enter the judgment as he did. Points 9 and 10 are overruled.

All other points have been duly considered, and believing them to be without merit, they are overruled.

For the reasons assigned, the judgment of the trial court is affirmed.

FUNDERBURK, J., concurring.

FUNDERBURK, Justice (concurring).

(Note: The following written as a tentative opinion of the Court is, while unchanged as to the language or subject matter, to be understood, of course, as expressing the individual views of the writer).

In an injunction suit by Albert Adkisson et al. against Brazos River Conservation and Reclamation District (hereinafter referred to as the District), the defendant brought a cross action as provided in Revised Statutes 1925, Art. 3269, Vernon's Ann.Civ.St. art. 3269, for condemnation of properties against the plaintiffs as separate owners of different tracts of land. Severances were decreed with the result that one action was between the District and Albert Adkisson, the former seeking condemnation, to the extent of an easement therein, of a certain oil and gas leasehold estate of Adkisson in 487 acres of land. Upon a non-jury trial the Court awarded condemnation as prayed with damages in the sum of $94,080.17, together with legal interest from date of judgment.

The District has appealed.

The principal question to be decided may,. we think, be fairly and sufficiently stated as follows: In the proper exercise of a: power of eminent domain, whereby condemnation is sought of an easement in land consisting only of oil and gas in place in the ground and/or such rights as. are conveyed from lessor to lessee in an ordinary oil and gas lease, under which oil is being produced through means, in part of casing in wells, tanks, flow lines, power-house, engines, etc., the use of which will be destroyed, should the value of the property to be condemned be ascertained by including such casing in wells, tanks, flow lines, power house, engines, etc., or should. these elements be excluded.

This question, it is believed, would involve little difficulty but for the anomalies. which, under decisions of the courts of this state, exist as to the nature of the interests and rights evidenced by an ordinary oil and gas lease. Under these decisions, an oil and gas lease, almost regardless of its wording, evidences a conveyance, not of an incorporeal right or interest in land,. but of land itself—a corporeal thing—consisting only of oil and gas in place under the ground. The nature of the estate in such minerals ranges in character from the highest—fee simple—down to the lowest estate, perhaps; but usually is a determinable fee—a freehold estate of inheritance. The owner of land, who in form conveys the oil or gas to another, without conditions or limitations conveys a fee simple estate in part of his land, thereby segregat--

ing such part from the land not conveyed, with the result that the grantor (or his heirs or assigns) thereafter owns the land, except the oil and gas, as a fee simple estate (if that was what it was before), and the grantee (lessee or his heirs or assigns) owns the oil and gas as a fee simple estate. Humphreys-Mexia Co. v. Gammon, 113 Tex. 247, 254 S.W. 296, 29 A.L.R. 607. Aside from the easement thereby imposed upon the land not conveyed, which if not expressed, the law would, nevertheless, imply (3 Tiffany on Real Property, § 761; Evans v. Ropte, 128 Tex. 75, 96 S.W.2d 973), an owner of land who conveys to another the oil and gas in the land vests in his grantee, according to such decisions, a fee simple estate in land, precisely the same as if he conveyed, for example, a particular quarter section out of a section of land.

But calling two utterly dissimilar things the same does not make them the same as in this instance the judicial history of this state amply attests. The proposition that an oil and gas lease conveys corporeal real property, governed by the general rules and principles relating to freehold estates in land is a fiction. It is a fiction because it is impossible to apply to it the rules and principles, which from time immemorial have been applicable to determinable fee estates in land as corporeal property. The reason for the recognition of such fiction was the erroneous assumption that unless such a lease is held to convey land, as contradistinguished from incorporeal rights and interests in land, the rights and interests conveyed, however valuable, would escape taxation against the lessee, and, therefore, either escape taxation altogether, or the burden of its taxation would be imposed upon the lessor-owner of the land and not the owner of the lease. Such assumption, if not expressed, is clearly implied in the two leading cases of Texas Company v. Daugherty, 107 Tex. 226, 176 S.W. 717, L.R.A.1917F, 989, and Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S.W. 290, 29 A.L.R. 566, as we shall endeavor to show.

Was the assumption erroneous? In our opinion the Supreme Court, speaking through the same great lawyer who wrote the opinion in the Mid-Kansas case has, in logically necessary effect, subsequently so decided, as also we shall presently attempt to demonstrate.

But before doing so, in support of the statement that the proposition referred to as a fiction is truly such, let us enumerate and comment briefly upon some of the incongruities involved in attempts to apply the laws governing freehold estates in corporeal real property to oil and gas in place in the ground as distinct from the land in which they are embedded. In this part of the discussion, for brevity, we shall use the word "deed" as meaning a conveyance of a fee (simple or determinable) estate in corporeal real property, and the word "lease" as meaning a conveyance of a fee (determinable) estate in corporeal real property, consisting, however, only of oil and gas in place in the ground.

Logically, if the estates are truly the same the law as applicable to a deed and the estate it conveys must be applicable to a lease and the interest it conveys; but practically the two are so essentially different, that in some instances such application is impossible and even when possible, the result is often so unreasonable, or so greatly at variance with the actual intention of the parties that the courts have declared exceptions as applied to leases which in themselves demonstrate the essential difference in the character of the two kinds of estates.

Let us call attention to some of these differences.

First. A deed is ineffective unless its subject matter—corporeal real property—is in existence. A lease is not ineffective although its subject matter—oil and gas called land—has no existence. Otherwise, a great majority of leases are ineffective, since it is a matter of common knowledge that far more tracts of land contain no oil or gas than those which do. One who pays his money for a deed, which is ineffective because of the non-existence of the subject matter of the conveyance, is logically entitled to a return of his money. Should the same be true of one who pays his money for a lease upon land in which there is no oil or gas? If the two estates are identical in nature, why not? Is not the answer obvious that, in greater or less part, the value of a lease is the value of the exclusive right to the *chance* of discovering oil or gas which only, if and when discovered and produced, becomes the property of the lessee? Such value exists even when the land, as subsequently found, contains no oil or gas. Such value is pre-

sumably the basis of agreement as to the consideration to be paid.

Second. The subject matter of a deed is, within the distinction between actual and constructive possession, capable of actual possession. The subject matter of a lease within such distinction is not capable of actual possession. In the Daugherty case the Court expressed its recognition of the fact that oil and gas until subjected to actual control, were incapable "of absolute ownership *in the sense of positive possession.*" (Italics ours.) [107 Tex. 226, 176 S.W. 720]. Possession means use; actual possession, actual use. There can be no actual use and, therefore, no actual possession of oil or gas, in place in the ground, as something distinct from possession of the land in which it exists. The only possible actual possession of oil or gas, as property, distinct from the land from which same may be produced, follows, and is dependent upon the process by which the oil or gas, as a part of land, is by severance from the land converted into personal property. Courts, in attempting to apply limitation laws governing corporeal real property to oil and/or gas in place, as corporeal property, distinct from the land in which such minerals exist, have said much that was illogical and vague, to say the least. They fall far short of explaining reasonably or consistently how the mere act of converting a part of land—oil or gas in place in the ground,—useless and valueless except as part of the land,—into personal property of use and value, constitutes actual *possession,* to say nothing of actual adverse possession, not of the oil or gas so taken into possession, not of the land in which such minerals are embodied, but possession of the oil or gas not so converted into personal property, but yet remaining, as before, in place in the ground. Oil and gas in place cannot be fenced to give notice of the extent of possession; they cannot be cultivated, used or enjoyed in any sense comparable to that in which land must be cultivated, used and enjoyed, as additional evidence of adverse possession, under the five years' statute of limitation. R.S.1925, Art. 5509. In the absence of any production of oil and gas, at least in the absence of any exploratory drilling operations, our decisions would support the proposition that the laws of limitation, as applicable to the subject matter of a deed, can have no operation as to the subject matter of a lease.

Third. The title to land, as the subject matter of a deed, cannot be lost by abandonment. Dikes v. Miller, 24 Tex. 417. This proposition is necessarily implied in the well known legal truism that freehold estates terminate, if at all, only as the result of conditions or limitations in the deed. The title to land (oil and gas) as the subject matter of a lease may under the decisions be lost by abandonment. W. T. Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27; Texas Co. v. Davis, 113 Tex. 321, 254 S.W. 304, 255 S. W. 601. This is an especially good example of the refusal of the court to apply the law applicable to determinable fee estates in land to the fictional determinable fee estates in oil and gas as land. The reason is obvious. The court was unable to close its eyes to the obvious fact that the parties to the lease had no intention to convey rights not subject to loss by abandonment.

Fourth. A deed, in addition to express covenants (and possibly such, if any, as may be implied from the language of express covenants), by statutory provision can have at most only two implied covenants, neither of which requires the owner to make any particular use of the land or perform any character of work, or carry on any particular operations, thereon. R. S.1925, Art. 1297. Because of the actual difference between the subject matter of a deed and a lease, the courts have in the face of said statute declared the existence, in a lease, of implied covenants for reasonable development and protection against off-set drainage. This too is a most apt example of a practical denial of the real identity of the estate conveyed by deed with the state conveyed by lease.

Fifth. As to the interest conveyed by deed, the purpose of the conveyance is immaterial. As to the interest conveyed by lease, the purpose of the conveyance is accorded controlling effect; it constitutes the basis for implying covenants not expressed and as to a deed prohibited by statute, as aforesaid. Giving effect to the purpose is logically essential to the holding that a freehold estate may be lost by mere abandonment. Because of the purpose of a lease, the owner of a determinable fee estate in oil and gas as land, unlike the owner of such estate in other land, cannot do with his land as he pleases, cannot use it or not use it as he pleases.

Other examples could be given to emphasize such differences and the consequent impossibility in some respects and impracticability in others, of applying the same rules and principles to such entirely dissimilar rights or interests. However, it is believed that the foregoing, as examples, will be sufficient.

Was it necessary, in order to tax the interest of a lessee against him and not against the lessor, that it be held that a lease conveys a determinable fee estate in oil and gas, in place, under the ground as corporeal real property? As said before, such an assumption, if not expressed, is certainly implied in the opinions in the Daugherty and Mid-Kansas cases. In the first case the court said in the beginning that the question for decision was "Whether the interests or rights conferred upon the Texas Company, in virtue of a number of so-called oil leases, constituted *property subject to taxation in its hands.*" (Italics ours.) It was stated that said "Question is to be resolved, in our opinion, by the determination of whether the instruments involved conferred upon the plaintiff in error *an interest in the lands* therein respectively described." (Italics ours.) Thereinafter, the opinion discloses clearly the assumption of the Court that the question "of whether the instruments involved conferred upon the plaintiff in error [lessee] an interest in the lands therein respectively described", was in turn dependent upon the question of whether said instruments were conveyances of oil and gas in place as corporeal real property. The court said: "We are not dealing with conveyances of simply the right to take the oil and gas from the ground", or, in other words, of conveyances of the character as contended by the lessee. The implications in that statement appear more clearly from the previous decision of the court in National Oil & Pipe Line Co. v. Teel, 95 Tex. 586, 68 S.W. 979, wherein it was held that leases of the kind there in question were not conveyances of legal title to *any interest in land*. This view was still maintained in the Daugherty case, the court saying: "There are essential elements of difference between the contract considered in that case and the instruments here under review. * * * The contract [in the Teel case] was construed properly as the creation of a mere option which *permitted the acquisition of an interest* or performance of conditions—a mere optional *right to acquire an interest in land,* a character of instrument plainly distinguishable from those here presented." (Italics ours.) Thus does it appear with certainty that the decision in the Daugherty case was based upon the assumption that unless the leases had the effect of conveying the oil and gas in place as land they conveyed no interest in land and were not taxable as property of the lessee.

In the Mid-Kansas case the distinction above declared between the leases in the Daugherty case and the Teel case was denied and it was decided that they had the same effect. Concerning the above language dealing with such distinction, the court in the Mid-Kansas case [113 Tex. 160, 254 S.W. 293, 29 A.L.R. 566] said: "Much reliance is put on such expressions in the opinion in the case of Texas Co. v. Daugherty * * * as that if the effect of the instruments there considered had been but the creation of a privilege to devote the land to a certain use, coupled with the right to appropriate a portion of such gas or oil as might be discovered, the privilege and right would not be separately taxable", to which it was replied: "The court's determination that the instruments before it had an altogether different legal effect makes it obvious that these expressions concerned matters not presented for decision"; that "It was never intended that such argumentative expressions should be taken as authoritative".

In the Mid-Kansas case the question for decision was "Whether appellee [the lessee] acquired, under the [therein] above-mentioned instruments, such interests or such estates in land as were subject to separate taxation." Thus it appears that the question for decision was the same as in the Daugherty case, the only difference being that it arose because of differences in the form or provisions of the leases. Two contentions of the lease owner appear from the opinion. One was: "Denial that these instruments passed separately taxable interests in lands", of which the court said: "[it] is grounded first on the proposition that there is no such thing as ownership or conveyance of gas or oil in place, because, until the gas or oil is brought to the surface and reduced to possession, any owner of land adjacent to that containing the gas or oil may lawfully appropriate same." The other contention is revealed in the following language: "But it is earnestly insisted that the in-

struments conveyed only *incorporeal hereditaments appertaining to the lands,* and that the terms of the instruments precluded the vesting of title to the gas and oil save as personalty after being brought to the surface." (Italics ours.) Had the court then been of the same opinion as subsequently formed and expressed in Sheffield v. Hogg, 124 Tex. 290, 77 S.W.2d 1021, 1030, 80 S.W.2d 741, it would have found it wholly unnecessary to answer the first of said contentions, that is, whether oil and gas in place was capable of ownership and conveyance as land apart from the land wherein they are imbedded. Under the logic of said later decision, that question was immaterial to the one before the court for decision. The court could well have answered: we adopt the lessee's contention "that the instruments conveyed only incorporeal hereditaments appertaining to the lands" and regardless of whether or not "the terms of the instruments precluded the vesting of title to the gas and oil, save as personalty, after being brought to the surface", the issue must be determined against the lessee. In other words, the court could very well have said that granting the lessee's contention as last noted, it settles the whole issue against it because "incorporeal hereditaments pertaining to the lands" are interests in the lands, they constitute property belonging to the lessee; and under the Constitution and laws of this state they are taxable against him. The court could have said, as it did say in Sheffield v. Hogg, supra, with reference to rights not precisely the same, but not differing in nature or character: "Classify them [the rights of the lessee as evidenced by the leases] as you may, they are at least rights or privileges belonging or in some wise appertaining to real property," and, therefore, of course, subject to taxation against the owner of such rights.

Looking backward, it also appears that the same answer could have been made in both the Daugherty and Mid-Kansas cases. Furthermore, had such answer been made in the Daugherty case, the decision in the Teel case would have then been overruled, not distinguished and thereby postponing such overruling to the Mid-Kansas decision, which did overrule it, but only upon a ground still embracing the erroneous assumption, as said later decision shows, that unless such a lease conveyed oil and gas in place as corporeal real property, it conveyed no interest in land whatever. Had the question in the Daugherty and Mid-Kansas cases been answered in accordance with the reasoning later employed in Sheffield v. Hogg, supra, the fiction to the effect that an oil and gas lease almost regardless of form, conveys a determinable fee estate in land as corporeal property, with its attendant incongruities, examples of which have hereinbefore been given, and to which many more could be added, would, no doubt, we think, never have received recognition in this state.

Let us next consider the Sheffield v. Hogg case and some of our judicial history preceding it and following the Daugherty and Mid-Kansas decisions. In the Mid-Kansas decision it was implied, if not expressed, that a lease conveys title to *all* of the oil and gas. Such effect of a lease was recognized in early cases following the Mid-Kansas case, as, for example, Caruthers v. Leonard, Tex.Com.App., 254 S.W. 779.

Later the Supreme Court was confronted with the question of whether certain *royalty interests* were taxable against the owner. Evidently under the same opinion or assumption as before, that such question as to royalty interests, like the question as to lease interests, depended upon whether such royalty interests constituted corporeal real property, and not mere incorporeal rights therein, the court decided that if a royalty provision obligated the lessee to deliver a part of the oil or other minerals produced in kind as royalty, as, for example, 1/8th of the oil,—such being the character of provisions then in question— such provision constituted an exception of 1/8th of the oil from the conveyance of all the oil to the lessee and was taxable against the owner. Hager v. Stakes, 116 Tex. 453, 294 S.W. 835. It was a necessary implication, of course, that if the royalty provision obligated the lessee to pay royalty in money, as, for example, $100 per annum per well, for each gas well such provision would constitute no exception; the title to all the gas would pass to the lessee, and he, if anyone, and not the royalty owner, would be liable for taxes thereon.

Then came the day when the court was called upon to say what about royalty owners under leases providing that the lessors "shall have 1/8th interest in all money realized from gas marketed from said land, and for the sulphur or other minerals,

$1.00 for each ton produced and saved from the land under quarterly cash settlements?" Was the right or interest in land evidenced by such royalty provisions subject to taxation against the royalty owner? Here again, it is apparent, was the same old question which had so frequently arisen before and like Banquo's ghost would not down, that is, it was the same question insofar as it could be affected by questions of whether or not the interest involved was land itself—corporeal real property—or interests in land—incorporeal real property. As already seen, a negative answer to this question was necessarily implied in Hager v. Stakes, supra. In other words, the holding, in effect, in that case that the royalty interests there in question were taxable against the lessor, or his assigns, *because* it consisted of oil in the ground, excepted from the conveyance of all the oil to the lessee, and could of necessity have no application to a royalty provision not constituting such an exception, and where title to all of the oil or gas, as the case might be, was conveyed to the lessee. The opinion is too long for analysis here. A great part of the discussion and authorities cited and quoted relate to incorporeal interests in land. We regard it as so fundamental that the same interest or estate in land cannot at the same time be both *corporeal* and *incorporeal*, that we feel warranted in assuming that it will not be questioned. By way of example, the opinion [124 Tex. 290, 77 S.W.2d 1028] quotes Thompson on Real Property [Vol. 1, pp. 313, 314, § 240] relating to a right to rents in land to the effect that unaccrued rents "are incorporeal hereditaments". After reviewing many authorities at length, mostly discussing incorporeal interests in land, the court, after referring to the statutory definition of land as taxable property, including "the rights and privileges belonging or in any wise appertaining" to land, concludes as follows: "Reading the Constitution and statutes together, there is no escape from the conclusion that interests here involved are meant to be taxed as real estate. Classify them as you may, they are at least rights or privileges belonging or in some wise appertaining to real property", etc.

Thus the court reached a conclusion on the basis of which the Daugherty and Mid-Kansas cases, Hager v. Stakes, supra, and scores of other cases could have been properly determined to the same effect as respecting the question to be decided without resort to the fiction that leases convey title to oil and gas in place in the ground as corporeal real property; but instead, based upon the truth and fact that they convey incorporeal rights in the land of another, which, being in gross and exclusive even as against the owner of the land, may constitute and generally do constitute freehold estates in the land, separate from the ownership of the land as such, and possessing the usual attributes of such interests in land, including liability to taxation against the owner thereof.

The nature of such an interest in land and the fact that it might constitute a determinable fee estate in land, was recognized and discussed by the Supreme Court and identified as a profit à prendre in Texas & P. Ry. Co. v. Durrett, 57 Tex. 48. Tiffany says: "A person may have a right to take minerals from another's land in the nature of a profit à prendre. * * * A right to take oil or gas from land in which the person so entitled has no right of ownership is likewise, though not always expressly so stated, a right of profit à prendre. 'Under the usual oil and gas lease,' it has been said, 'the owner-lessor transfers to his lessee his right to drill for and produce oil and other substances. The rights of the lessee present a clear case of a profit à prendre in gross, a right to remove *a part of the substance of the land.*' And in such case, the lessee has an interest in the land in the nature of an *incorporeal hereditament."* (Italics ours.) 3 Tiffany on Real Property, § 846.

Further says the same authority: "A profit à prendre, * * * is the right of one to remove and appropriate for his own use some thing or things from the soil of another, or things growing in or attached to or existing on such other's land. * * * The distinguishing feature of profit à prendre is the right to appropriate and take from the land charged with it a part of the soil or product of it in which there is supposable value. Each right [easement or profit à prendre] requires the use of the land in which it exists, and *to use is to possess.* Each, [easement or profit à prendre as aforesaid] therefore, involves possession, though the title and broader right of possession is in another. Each [as aforesaid] implies such estate in the land as may be necessary to the enjoyment of the right. Each is *incorporeal real property."* 3 Tiffany on Real Property, § 840. See, also, Bender v. Brooks, 103 Tex. 329,

127 S.W. 168, Ann.Cas.1913A, 559; Right of Way Oil Company v. Gladys City Oil, Gas & Mfg. Co., 106 Tex. 94, 157 S.W. 737, 51 L.R.A.,N.S., 268.

The question is whether now after the decision in Sheffield v. Hogg it is our duty, because of its oft repetition, to continue to recognize the fictional nature of the rights conveyed by an oil and gas lease with the attendant incongruities, inconsistencies, and frequently occurring difficulties of application to different states of fact, as they arise, or to recognize its true nature and thereby enable us to apply the law consistently and logically in the determination of new questions arising, as in this case.

This Court has been confronted with this same question before, and after much consideration decided to abandon the fiction and to recognize and give effect to the truth. Xray Gas Co. v. Lone Star Gas Co., Tex.Civ.App., 139 S.W.2d 142. The Supreme Court in that case, 139 Tex. 546, 164 S.W.2d 504, 505, expressed no opinion upon this point, but gave conclusive effect to a practical construction of the instrument therein involved. The Court, however, repeatedly referred to the instrument as a "gas purchase contract", a designation none too apt, it would seem, if as adherence to the fiction required it was really a deed conveying the gas in place as land.

In reaching our conclusion it has been necessary, of course, to consider the possible effect of the doctrine of stare decisis, but we have been unable to imagine any case where because of abandonment of the fiction and adoption of the truth any right of any person could be adversely affected. No recognized attribute of the interest conveyed by a lease would be taken away; none constituting infirmities would be added. The principal effect would be to permit application of time honored rules and principles, without necessity of declaring exceptions and forced distinctions smacking so loudly of judicial legislation.

In the instant case, assuming adherence to the fictional nature of the interest conveyed by the oil and gas lease, the District presses the point that the fixtures, even if real fixtures, are not attached to the oil and gas in the ground—the only land owned by Adkisson and the only property sought to be condemned in this case—but, if attached to any land, they are attached to the land of the lessors or their assigns, not involved in the condemnation sought in this case. The logical force of the argument is ines-

capable. It is easy for us to see, however, that the "casing in wells, tanks, flow lines, power house, engines", etc., included in the above reference to "fixtures", are so essential and so certainly constitute a part of the value of Adkisson's interest in the land —an exclusive right, in gross of profit à prendre—that the damage for the taking, or destruction of such right cannot be measured so as to afford just compensation except by ascertaining its value as enhanced by the uses of such fixtures. It is, therefore, our conclusion that no error is shown in the action of the court in so determining the damages.

In arriving at such total damages, measured by the total value of the right of profit à prende, the Court, we think, did not err in hearing testimony of the separate values of the different fixtures. It seems clearly evident from the record that the court recognized the proper issue and such evidence was merely considered in arriving at the value of the interest condemned.

However, if we, not being a court of final jurisdiction, should be overruled in our conclusion that the property condemned is an exclusive right of profit a prendre, governed by the laws applicable to incorporeal rights of such nature; but, on the contrary, that the rights involved are of the nature which we have labeled as fictional, then we hold with certainly no more inconsistency than the holdings for example that such an estate may be lost by simple abandonment or be burdened with implied covenants for reasonable development or protection from off-set drainage, and for equally strong reasons, that the fixtures bear the same relation to the oil and gas, in place, as real fixtures bear to land generally; that their use enters into the value of the property taken or destroyed for public use, and the court has properly found such value by including the enhancement resulting from the use of such fixtures.

The Court found that the property condemned was taken as of date, October 30, 1940. In addition to the main award of damages, in the sum of $90,000, the Court awarded interest which, but for the off-set hereafter stated, amounted to $8,550. It was in evidence, however, that after October 30, 1940, Adkisson produced from the lease oil of the net value of $4,479.83, with which sum the Court off-set said amount of interest in the sum of $8,550 and gave judgment for the balance in addition to said $90,000, or the total sum of $94,080.17.

The District contends that the Court erred in not allowing it interest upon this net value of oil produced after the date the lease was condemned. Granting that such interest was legally allowable, in our opinion, it was a matter of off-set. The burden was upon the District at least to supply the requisite evidence to enable the court to make the proper calculation and award the proper amount. There ·was an absense of such evidence, and because thereof we are of the opinion that no error in this respect is ·shown.

Being of the opinion that the judgment ·should be affirmed, it is accordingly so or-·dered.