Thornton LOMAX, Jr., et al., Appellants,

v.

Donald M. HENDERSON et
al., Appellees.

No. 5808.

Court of Civil Appeals of Texas,
Waco.

Dec. 8, 1977.

Rehearing Denied Dec. 29, 1977.

Ross H. Hemphill, Ray, Trotti, Hemphill, Meadows & Hahn, Dallas, for appellants.

Joe B. Cannon, Cannon, Cannon & Reed, L. L. Geren, Bradley & Geren, Groesbeck, for appellees.

HALL, Justice.

The Brazos River Authority condemned certain interests in land for the construction, operation, and maintenance of the Sterling C. Robertson Dam and Lake Limestone on the Navasota River in Limestone, Leon, and Robertson Counties. A part of the land was 200 acres located in Limestone County of which appellees owned all of the surface and an undivided interest in the minerals, and appellants owned an undivided one-fourth mineral interest in 64 acres. In its statement of condemnation the Brazos River Authority sought the following interests in the land: "Fee simple title in and to the [200 acres], except that defendants shall retain all oil, gas, and other minerals, in, on, or under said land, it being provided, however, that no operations for the recovery of any such oil, gas, and other minerals shall be conducted on the surface of said premises."

In the condemnation proceeding, the commissioners awarded $120,000.00 "as compensation for the land and interest in the land being taken." They did not apportion this award among the owners. The amount of the award was not objected to by appellees, and it was deposited into the registry of the

court. Eventually, judgment was rendered in the condemnation proceeding awarding Brazos River Authority "fee simple title in and to the [200] acres, except that defendants shall retain all oil, gas, and other minerals in, on or under said land, it being provided, however, that no operation for the recovery of any such oil, gas, or other minerals shall be conducted on the surface of said premises." The order also awarded the $120,000.00 to the condemnees "with division of said sum to be in accordance with the order of the Court to be entered at a later date."

Thereafter, appellees filed a Motion to withdraw the $120,000.00 asserting they were entitled to all of it because they owned the entire surface of the 200 acres and because the mineral interests in the land were not condemned. Appellants intervened, asserted their ownership of "a net sixteen mineral acres," and alleged "they have been damaged by said condemnation taking of said minerals at the sum of $250.00 per mineral acre, making a total of $4,000.00." The other mineral owners did not intervene. After a hearing without a jury, the court awarded all of the money to appellees. In its order the court found that appellees owned the surface in the land condemned; that appellants own an undivided sixteen acre mineral interest in the land; "that none of the oil, gas, or mineral interest was condemned under said award"; and "that said minerals lying in, under, and that might be produced from the property condemned have no reasonable cash market value." This appeal was prosecuted from that order. We affirm the judgment.

Appellants come forward with two points of error asserting (1) there was a compensable taking of their interest in the land as a matter of law, and (2) the court's finding that their mineral interests had no market value is contrary to the great weight of the evidence.

■ It is settled in Texas that the ownership of minerals in place carries with it, as a necessary appurtenance thereto, the right to reasonably use so much of the surface as may be necessary to enforce and enjoy the mineral estate. "This is because a grant or reservation of minerals would be wholly worthless if the grantee or reserver could not enter upon the land in order to explore for and extract the minerals granted or reserved." *Harris v. Currie,* 142 Tex. 93, 176 S.W.2d 302, 305 (1944).

Although appellants used the words "taking of said minerals" in their plea of intervention, they do not contend that the minerals in place on the 200 acres were condemned. Rather, they argue that although their "mineral interest is not yet expressly condemned" and the ownership is still in them, the taking of the surface easement has rendered their mineral estate valueless and that they are entitled to compensation for this damage from the condemnation award.

■ Without question, appellants' right of use of the surface of the land in question was taken from them. The proper measure of this loss, and the one sought to be shown by appellants on the trial, was the diminution of value of their mineral estate by the taking. Vernon's Tex.Civ.St. art. 3265.

Appellants' value witness was Murray Johnson, who is one of the appellants. He resides in Dallas County. He has been in the oil and gas business since 1948. Appellees' value witness was Roger Steward. He lives in Freestone County. He has been engaged in the oil and gas business since 1922. Johnson testified that the reasonable market value of appellants' minerals was $250.00 per mineral acre. Steward testified the minerals had no market value.

We need not detail the testimony of the two witnesses. Both own oil and gas interests in the vicinity of the 200 acres. Both expressed familiarity with the locations and production of developed oil and gas fields in Limestone and Freestone Counties. Both have bought, sold, and leased oil and gas interests in the area in question, but the trial court would have been justified under the evidence in believing that Steward's activities in these respects was much broader than Johnson's. Steward has also participated directly in drilling many wells in the

**468**

area. Some were producers and some were not. One non-producer drilled by him was only 700 feet from the 200-acre tract; another was less than two miles away. Steward inferred that the 200-acre tract is situated off the productive oil and gas formations.

■ Conflicts in the testimony of property value witnesses in eminent domain cases are common. These conflicts simply raise questions for the trier of the facts. Here, it was the trial judge's prerogative and duty as the fact-finder to consider the position, interest, experience, and knowledge of the witnesses, weigh their testimony, pick out what he believed to be the most credible parts, and make his findings accordingly.

A part of Steward's testimony was this: "Actually, there is no market value on it. I don't know how I could answer your question as you want it, but that is one thing I don't know of any way to estimate the market value because it would be based on seismic work, scientific information as well as a belief in what you think you are going to get, and so there is a bunch of variables in there that I couldn't quite estimate. I might estimate what I would pay or wouldn't pay.

.    .    .    .    .

"Q. Do you own any minerals yourself that you say you put no value on?
"A. I didn't say that I didn't put no value on them.
"Q. What was your testimony about the value of the minerals?
"A. I said there was no market value in it, which I think is a different thing."

Appellants argue in effect that this testimony destroys the probative worth of Steward's testimony on market value. We disagree. To the contrary, it shows the witness believed the only possible value of the minerals was a nominal, speculative one. Appellants do not seek nominal damages.

■ We cannot say the trial court's finding is so contrary to the great weight and preponderance of all of the evidence as to be manifestly unjust. That is the test. *In*

*re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1952).

Appellants' points are overruled. The judgment is affirmed.

JAMES, Justice, dissenting.

I respectfully dissent. My opinion is based upon two basic premises:

(1) That Appellants are entitled to damages under Article I, Section 17, of the Texas Constitution, based upon the difference in the cash market value of their mineral rights immediately before and immediately after the taking by the condemning authority, which was included in the $120,000.00 award; and

(2) The trial court's finding that Appellants' mineral rights had no market value is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate* (1952) 150 Tex. 662, 244 S.W.2d 660.

The trial court's order recites that "none of the oil, gas or mineral interest was condemned under said award"; however, the Statement of Condemnation filed by the Brazos River Authority specifically provides that "no operations for the recovery of any such oil, gas, and other minerals shall be conducted on the surface of said premises ----."

The condemning authority did not "take" the entire mineral rights of Appellants; however, such authority "took" Appellants' rights to the use of the surface for the recovery of the oil, gas, and other minerals. This was the taking of an interest in real estate and in my opinion was the taking of important property rights.

Here, Appellants own mineral rights in sixteen acres of land. Appellants own no surface rights. All of the land under which Appellants own this mineral interest is proposed to be put under water for lake or reservoir purposes. Appellants own no surface rights in land anywhere nearby the sixteen acre interest.

Article I, Section 17, of the Texas Constitution in its pertinent parts provides:

"No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person; _ _ _ _."

In the case at bar, we are not called upon to decide whether Appellants' interest in real estate has been "taken" or "damaged"; it is well settled that Appellants are entitled to compensation in either event. Our Supreme Court has held that a direct physical invasion of property is not required under the eminent domain section of our Constitution for a property owner to be entitled to compensation for the damaging of his property for a public use. *DuPuy v. City of Waco* (Tex.1965) 396 S.W.2d 103; *Spann v. City of Dallas* (1921) 111 Tex. 350, 235 S.W. 513. In *DuPuy,* it was held that the property owner was entitled to compensation under Article I, Section 17, of the Constitution for damages for unreasonable interference with his "easement of access" of his property, which was measured by the diminishment in the market value of his property resulting from such loss of access. In *Spann,* the Supreme Court said:

"Property in a thing consists not merely in its ownership and possession, but in the unrestricted right of use, enjoyment and disposal. Anything which destroys any of these elements of property, to that extent destroys the property itself. The substantial value of property lies in its *use. If the right of use be denied, the value of the property is annihilated and ownership is rendered a barren right.*" (emphasis supplied).

The Supreme Court of Texas has expressly refused to compartmentalize an exercise of the sovereignty as either police power or eminent domain for the resolution of problems under Article I, Section 17. *DuPuy,* and the cases cited therein in Volume 396 S.W.2d at page 107. Also see *San Antonio River Authority v. Garrett Brothers* (San Antonio, Tex.Civ.App. 1975) 528 S.W.2d 266, NRE; *City of Austin v. Teague* (Waco, Tex.Civ.App. 1977), opinion dated September 28, 1977, 556 S.W.2d 400. Also see *Trinity River Authority v. Chain* (Beaumont, Tex.Civ.App. 1969) 437 S.W.2d 887, NRE; *City of Houston v. McCarthy* (Houston, Tex.Civ.App. 1st 1971) 464 S.W.2d 381, NRE.

It is well settled in Texas that the mineral interest is the dominant estate in land, and as such, carries with it, as a necessary appurtenance thereto, the right to go in and upon the surface of land in order to produce and market the oil, gas and other minerals. *Harris v. Currie* (1943) 142 Tex. 93, 176 S.W.2d 302; *Brazos River Conservation and Reclamation District v. Adkisson* (Eastland, Tex.Civ.App. 1943) 173 S.W.2d 294, writ refused. In *Harris v. Currie,* supra, our Supreme Court says at page 305:

"The mere grant or reservation of minerals in place does not vest the grantee or reserver with any title to the surface. In spite of this, the grant or reservation of minerals carries with it, as a necessary appurtenance thereto, the right to use so much of the surface as may be necessary to enforce and enjoy the mineral estate conveyed or reserved. This is because a grant or reservation of minerals would be *wholly worthless* if the grantee or reserver could not enter upon the land in order to explore for and extract the minerals granted or reserved." (emphasis supplied).

In *Adkisson,* supra, at page 301, the court said:

"Under the authorities we do not believe that the rules of law applicable to the condemnation of an easement in a leasehold estate differ in principle from the rules applicable to the condemnation of a fee or interest owned by the lessor. As a practical matter it was in no respect feasible for Adkisson to drill in the water and produce oil. The use and value of his property was destroyed, as in the case of *United States v. Lynah,* 188 U.S. 445, 23 S.Ct. 349, 357, 47 L.Ed. 539, where the court, in disposing of a case where land was flooded by a dam, says:

'It is clear from these authorities that where the government by the construction of a dam or other public works so floods lands belonging to an individual as to substantially destroy their value there is a tak-

ing within the scope of the 5th Amendment. *While the government does not directly proceed to appropriate the title, yet it takes away the use and value; when that is done, it is of little consequence in whom the fee may be vested.'* " (emphasis supplied).

In the case at bar, Appellants were denied by the condemning authority of their right of ingress and egress, and the right to produce from the surface, even though they owned no title to the surface. Although Appellants' mineral interest is not expressly condemned, yet they have been denied the right to produce from the surface. In *Thompson v. Janes* (1952) 151 Tex. 495, 251 S.W.2d 953, our Supreme Court held that in cases of condemnation of easements where the easement deprives the owner of any beneficial use of the land, the landowner may recover as damages the market value of the land. Also see *Lower Nueces River Water Supply District v. Sellers* (San Antonio, Tex.Civ.App. 1959) 323 S.W.2d 324, 333, 334, NRE.

Appellees suggest that Appellants' minerals can be produced by "whipstock" or directional drilling, and therefore the minerals will not be valueless after the flooding. However, the testimony shows that whipstocking is substantially more expensive than regular drilling. But where would Appellants "whipstock" from? They do not own any surface nearby from whence whipstock operations could be conducted. See *Robinson v. Robbins Petroleum Corp.* (Tex. 1973) 501 S.W.2d 865.

Here, the condemnation by the Brazos River Authority deprived the Appellants of the beneficial use of their property, took their mineral easement, and as a practical matter left them with no alternate means of production. For these reasons, I would hold that Appellants are entitled to compensation out of the $120,000.00 award under Article I, Section 17 of the Texas Constitution, for the difference in the market value of their mineral rights immediately before and immediately after the taking by the condemning authority. Therefore, I would sustain Appellants' first point of error.

Appellants' second and remaining point of error asserts the trial court erred in finding that Appellants' mineral rights had no market value, and that such finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. I would sustain this contention.

There were two expert witnesses who testified concerning the value of the Appellants' mineral rights, one being Murray Johnson (one of the Appellants) for the Appellants, and the other being Roger Steward for the Appellees. Both witnesses had had many years of experience in the oil and gas business, much of which was had in and near the property in question.

Mr. Johnson testified that in his opinion the mineral rights in question had a cash market value of $250.00 per acre (or $4000.00 in all) immediately prior to the taking, and had no cash market value immediately after the taking. Johnson testified that the Oletha Gas Field, the Pokey Gas Field, the Southwest Oletha Field and the Freestone Field are all within one to four miles from the property in controversy, demonstrating that there is or has been oil and gas production in the immediate vicinity of the land in question. Additionally, he testified that the Hinton Drilling Co. was (at the time of trial) leasing near the land in controversy; and that on May 16, 1977, Appellants themselves received a $15.00 per acre oil and gas lease bonus plus an additional ⅛th royalty from a lease to the Fair Oil Co. for their interest in the land adjoining and in the same survey as the 200 acre Henderson tract; that Appellants had leased the minerals in controversy several times over the years for consideration comparable to that received by the Fair Oil Co; that a new well was presently (at the time of trial) being drilled some five or six miles from the mineral rights in controversy. Based on the fact that Appellants own no surface area adjoining the Henderson property and because of the substantial expense and impracticality of directional drilling, Johnson testified that the mineral rights in question would have no market value after the flooding of the surface.

There was evidence that two dry holes had been drilled about one and three quarters miles from the Appellants' minerals in question. Mr. Steward testified that a salt dome was hit at 13,634 feet on the A. W. White and O. A. Henderson tract before reaching the Smackover formation. But on cross-examination he testified that there had been Smackover production as deep as 16,000 feet in the area, particularly in Freestone County. Moreover, Steward could not say what the extent of the salt dome was, or how far or in what direction it ran. Steward testified that drilling had ceased on the L. B. Sims tract at 7,230 feet because it was not economically feasible to continue at that time. Concerning the effect of these two dry holes on the value of Appellants' minerals, Johnson said several factors had to be considered. First, dry holes simply meant there was no production at a given depth. Next, the profitability of the venture was an important factor. At the time of the drilling of the dry holes, gas was selling at six cents per 1000 cubic feet; whereas as of the time of trial there was evidence gas was selling for $2.30 per 1000 feet. Johnson said producers are likely to be more willing to undertake the risk if the profits promise to be greater, dry holes notwithstanding. Although the two dry holes in question were drilled sometime in the 1950's, yet there has been continued activity in the area. The two dry holes need to be weighed against the evidence of continued interest in the area, Appellants' bonus paid in May 1977 (of $15.00 per acre plus an additional ⅛th royalty) for their minerals in an adjoining tract, the Hinton Oil Companys' leasing operations, and the new well being drilled within six miles of the land in controversy. In my opinion the two dry holes testified about, when weighed against the other testimony and economic considerations hereinabove discussed, are not conclusive enough to render Appellants' mineral rights of no market value.

It is a matter of common knowledge that with oil and gas getting in shorter supply over the country, accompanied by greater demand, and the inevitable increase in the price oil and gas brings, and with the great increase of oil and gas explorations taking place, that the market value of mineral rights such as that owned by Appellants are influenced by such factors.

The majority apparently attaches considerable weight to their interpretation of what Steward said about the market value of Appellants' minerals, their interpretation being that Steward said the minerals had no market value. His testimony along this line was vague and when taken in context of his other testimony, in my opinion he did not exactly say that.

The following is an excerpt from Steward's testimony on direct examination:

"Q. All right then, are you acquainted with the reasonable cash market value or fair market value or fair value of minerals on undeveloped land in that area? I say are you?

"A. *I wouldn't say that.*

"Q. Well, I say you deal in minerals - - -

"A. yes.

"Q. - - - buy and sell gas and oil leases, it is your business to keep up with what it is buying and selling for and where they are drilling wells?

"A. Yes, that's right.

"Q. You might not have understood me. I am asking you if you are acquainted with the value of these minerals.

"A. Yes.

"Q. And what would you say would be the value of undeveloped minerals on the Donald Henderson 200 acre tract, taking into view the fact that you have got a dry hole just northwest of it and got a salt structure above the Smackover a mile and a half or so west of it, how much an acre would you say the minerals would be worth on the market today?

"A. Actually there is no market value on it. I don't know how I could answer your question as you want it, *but that is one thing I don't know of any way to estimate the market value because it would be based on seismic work, scientific information as*

*well a belief in what you think you are going to get, and so there is a bunch of variables in there that I couldn't quite estimate.* I might estimate what I would pay or wouldn't pay.

"Q. You estimate that it has no market value then?

"A. No actual market value in my opinion." (emphasis supplied).

In summary, Steward testified in one breath the minerals had no market value, and in another breath that there were so many variables involved that he was unable to estimate the market value. In another place in his testimony, Steward testified that there were Texaco units presently producing, the nearest of which were about two miles from Appellants' minerals.

From the record as a whole, I am of the opinion that the trial court's finding that Appellants' minerals immediately prior to the condemnation had no cash market value is factually insufficient under the test prescribed by *In re King's Estate,* supra. Therefore I would sustain Appellants' second point of error.

For the above reasons I would reverse the trial court's judgment and remand the cause between Appellants and Appellees for retrial.