**CORNISH TOWN, Plaintiff and Appellee,**

v.

**Evan O. KOLLER and Marlene B. Koller, husband and wife, Defendants and Appellants.**

No. 880121.

Supreme Court of Utah.

Aug. 1, 1991.

---

M. Byron Fisher, Michelle Mitchell, Salt Lake City, for the Kollers.

George W. Pratt, Jody K. Burnett, Salt Lake City, for Cornish Town.

HOWE, Associate Chief Justice:

Defendants Evan O. Koller and Marlene B. Koller, his wife, appeal from a judgment for $59,670 entered on a special jury verdict in their favor and against plaintiff Cornish Town.

## FACTS

Cornish Town commenced this action in July 1986 to condemn approximately one hundred acres of Kollers' land for the purpose of creating protection zones around Griffiths and Pearson Springs, which are on Kollers' property. The springs are a source of water for Cornish Town's culinary system as well as for Kollers' household. Cornish sought protection zones which cover a 1,500–foot radius around the springs in an attempt to reduce the high nitrate level in the water. Cornish also sought rights-of-way and access to the springs over another seven acres of Kollers' land. State water quality officials had advised Cornish that agricultural fertilization contributed to the high nitrate level. In response, commencing on September 24, 1981, Cornish enacted a series of ordinances authorizing the creation of these protection zones and prohibiting within them the use of pesticides and fertilizers, the keeping or grazing of animals, and human habitation.

After commencing the action, Cornish filed a motion for an order of immediate occupancy. After a three-day hearing where both parties presented evidence, the trial court granted the motion, concluding that there was competent evidence that it was "necessary and essential" that Cornish acquire the protection zones. The court further found that Cornish had not acted in bad faith and had not abused its discretion in bringing its action. Kollers filed a motion for partial summary judgment to fix the date of the taking of the property at September 24, 1981, when the first ordinance, No. 81–1, took effect. The motion was denied.

At the outset of the trial, Cornish moved to amend its complaint to seek only a perpetual easement over the one hundred acres after Kollers disclosed that they were going to claim that mineral deposits underlay the land. The amendment was granted. Kollers proffered evidence that deposits of zeolite underlay 94 acres of the property sought to be condemned, but the court would not admit that evidence or evidence that the estimated value of the deposits was $38 million, opining that their claim of mineral deposits was speculative. The court ruled that the issue of whether Kollers had a right to extract the minerals should be determined if and when they decided to mine the zeolite. Kollers also presented evidence as to wildlife resources on the land, specifically, a deer herd protected by them. However, they were not allowed to present a mathematical calcula-

tion of the potential monetary loss of future sales of hunting access permits.

Kollers attempted to present evidence that the taking would not improve the quality of the spring water. The trial court refused to hear the evidence, stating that public use and necessity had already been determined at the hearing on the motion for an order of immediate occupancy. The jury returned a special verdict in favor of Kollers for $59,670; they appeal.

## I

◼ Kollers contend that the trial court erred in denying them the opportunity to present evidence at trial on the question of whether the taking by Cornish was necessary and that they were entitled to have the jury determine that issue. Cornish responds that at the hearing on the motion for an order of immediate occupancy, the court properly determined, as a matter of law, that public use and necessity had been established by Cornish and that no showing had been made of bad faith, fraud, or abuse of discretion on its part.

## A

Utah Code Ann. § 78–34–4 provides in part:

> Before property can be taken it must appear:
>
> (1) That the use to which it is to be applied is a use authorized by law;
>
> (2) That the taking is necessary to such use....

Kollers' contention that they were entitled to a trial on the issue of necessity is based upon *Utah State Road Commission v. Friberg*, 687 P.2d 821, 832 (Utah 1984). In that case, this court primarily addressed the issue of the effect of delay in the prosecution of a condemnation action on the valuation of the property. We also determined that the hearing on the motion for an order of immediate occupancy was not a trial on the merits and thus res judicata did not operate. *Id.* at 833.

> An order of immediate occupancy is entered *pendente lite* and only authorizes the State to take immediate posses-

sion until a final adjudication of the merits....

> ....
>
> The State's right to condemn, if challenged, can finally be determined only after a trial on the merits, not at a hearing on the motion for immediate occupancy. Since an order of immediate occupancy only requires prima facie proof of the right to condemn, that order is not a final adjudication on the merits. Res judicata has no application in the absence of a final adjudication.

*Id.* (footnote and citations omitted).

There are important differences between the procedure followed by the trial court in *Friberg* and that followed by the trial court in the instant case. First, it appears that in *Friberg*, the state, the condemnor, presented only prima facie proof of the right to condemn at the hearing on the motion for an order of immediate occupancy. It does not appear that the condemnee presented any evidence. However, at the hearing in the instant case, both Kollers and Cornish Town introduced testimony and evidence in a three-day hearing, with Kollers vigorously challenging the necessity for the proposed taking. Second, following the hearing in *Friberg*, the order of immediate occupancy contained no findings or conclusions on the state's authority to condemn. The order stated that issues relating to the state's authority to condemn were to be decided in a "further hearing" and that the order was issued "pending further hearing and trial on the issues that may be presented in the action." *Id.* In contrast, in the instant case the trial court made and entered written findings as to the state's authority to condemn:

> 6. Although some experts may differ as to both the source of the nitrate contamination and the recommendations with respect to action which should be taken to alleviate the problem, that is not for the court to decide and there is substantial support in the record for the conclusions reached by Cornish town based on valid recommendations in doing the best they could to protect and improve the water supply. The Town has

acted reasonably and in good faith in its plan to improve the System as outlined to the Court.

7. In order to carry out its plan for improving the water supply, it is necessary and essential that Cornish acquire the protection zones in the watershed of the Griffiths Spring and Pearson Spring.

We therefore conclude that under the facts of this case, where the trial court permitted both parties to fully present and litigate the issue of the necessity of the proposed taking at the hearing on the motion for an order of immediate occupancy and entered written findings of fact sustaining the condemnor's right to condemn, the trial court was not obligated to allow the parties to again litigate that issue at trial. While it is true as pointed out in *Friberg* that an order of immediate occupancy is interlocutory and is subject to change should the trial court become convinced of the need to do so, it would be a waste of judicial resources to require a trial court to allow the condemnee to represent his evidence and arguments at trial. *Id.*

## B

■■■ Kollers contend that they are entitled to a jury trial on the issue of necessity of the proposed taking. Utah's statutes on eminent domain, Utah Code Ann. §§ 78–34–1 to –20 (1987), are silent regarding the manner of determining necessity, i.e., whether it is done by the court or the jury. Section 78–34–8 specifically mentions the powers of "the court or the judge thereof." Notably, the jury's power is not mentioned:

The court or judge thereof shall have power:

(1) to hear and determine all adverse or conflicting claims to the property sought to be condemned, and to the damages therefor, and

(2) to determine the respective rights of different parties seeking condemnation of the same property.

Only section 78–34–10 specifically mentions the jury:

The court, jury or referee must hear such legal evidence as may be offered by any of the parties to the proceedings, and thereupon must ascertain and assess:

(1) the value of the property sought to be condemned and all improvements thereon appertaining to the realty, and of each and every separate estate or interest therein.

Some jurisdictions specifically provide for jury trial of the issue of necessity. 1A J. Sackman & P. Rohan, *Nichols' The Law of Eminent Domain* § 4.11[4] (3d ed. 1990). Generally, however, the only question an owner is entitled to try to a jury is the amount of his compensation or damages, and he has no right to be heard by the jury on the necessity of the taking, which is a question of law for the court. 27 Am. Jur.2d *Eminent Domain* § 408, at 292 (1966); *see also Coachella Valley Water Dist. v. Western Allied Properties, Inc.*, 190 Cal.App.3d 969, 235 Cal.Rptr. 725 (1987) (pursuant to Cal. Const. art. I, § 19, the property owner in an eminent domain action is entitled to a jury trial on the question of just compensation; all other issues of fact and law must be decided by the court).[1]

It does not appear that the precise question which confronts us has been heretofore presented to this court for determination. However, dicta in two cases give support to the proposition that a landowner is not entitled to a jury determination on the question of the necessity for a proposed taking. In *Town of Perry v. Thomas*, 82 Utah 159, 22 P.2d 343 (1933), we stated, "Whether the property is being taken for a use authorized by law, that is a public use, is by statute in this state, and by the general rule of law, a judicial question and may

---

**1.** Under federal law, there is no constitutional right to a trial by jury in condemnation cases. Wright & Miller, *Federal Practice and Procedure* § 3051, rule 71A, at 120 n. 41 (Supp.1991). "Under rule 71A(h) as finally adopted, therefore, trial of all issues is by the court, except for the issue of just compensation." Wright & Miller, § 3051, at 122 n. 46; *see also United States v. 105.40 Acres of Land,* 471 F.2d 207, 212 (7th Cir.1972); *United States v. 21.54 Acres of Land,* 491 F.2d 301, 304 (4th Cir.1973).

be inquired into by the courts." 82 Utah at 165–66, 22 P.2d at 346 (citations omitted). Later, in *Bountiful v. Swift*, 535 P.2d 1236 (Utah 1975), we stated, "The trial judge, among other things, is given the power to hear and decide if the conditions precedent to taking are met." *Id.* at 1238. In both cases, we found support for those statements in a former subsection of section 78–34–8 which provided that the "court or judge thereof" shall have power to determine if the conditions precedent to taking contained in section 78–34–4 have been met, including whether the use to which the property is to be applied is a use authorized by law. That subsection was deleted from section 78–34–8 in 1981. *See* 1981 Utah Laws ch. 161, § 2. No reason for the deletion is apparent, but we have no reason to think that there was any legislative intent that the question of public use and necessity should be determined by a jury. We therefore conclude that based on what appears to be the majority rule in this country, on section 78–34–10, which limits the jury's role in condemnation cases, and dicta in former cases of this court, a landowner is not entitled to a jury determination of the public necessity of a proposed taking.

## II

■ Kollers next contend that the date of taking for purposes of assessing just compensation should be the effective date of Cornish's original ordinance, No. 81–1, which was September 24, 1981. Cornish counters that the date of the taking was appropriately held to be the date of service of summons, July 29, 1986, and that the enactment of town ordinances, including ordinances No. 81–1, No. 83–1, and No. 85–1, which it argues were never enforced, did not rise to the status of a regulatory taking.

Utah Code Ann. § 78–34–11 (1987) provides that the right to damages is deemed to accrue at the date of the service of summons:

> For the purpose of assessing compensation and damages, the right thereto shall be deemed to have accrued at the date of the service of summons, and its actual value at that date shall be the measure of compensation for all property to be actually taken, and the basis of damages to property not actually taken, but injuriously affected, in all cases where such damages are allowed....

See *City of South Ogden v. Fujiki*, 621 P.2d 1254, 1255 (Utah 1980); *State v. Jacobs*, 16 Utah 2d 167 n. 1, 397 P.2d 463 n. 1 (1964) (service of summons is controlling date for valuation purposes); *State ex rel. Eng'g Comm'n v. Peek*, 1 Utah 2d 263, 265 P.2d 630 (1953); *Oregon Short Line R.R. v. Jones*, 29 Utah 147, 80 P. 732 (1905).

Kollers rely on *Friberg*, 687 P.2d at 833, to support their contention. They argue that the presumption—that the date to determine valuation shall be the date of service of process—is rebutted here "by a showing that a valuation as of the date of service of summons would result in an award that would not provide 'just compensation' to a landowner." *Id.* However, the trial court specifically found that the special circumstances and factors of *Friberg* were not present here. It also determined that the enactment of ordinance No. 81–1 did not prohibit the use of Kollers' property, but rather attempted to control pollution of the town's water supply and was therefore not a regulatory taking.

In *Friberg*, the property owners argued that they were entitled to compensation and damages based on the value of their condemned property as of the date on which the state's right to condemn was finally determined—which was over seven years after service of summons. There was a substantial delay in the entry of a final decree, and the property had appreciated in value in the interim. It was stated in part III of the plurality opinion that the delay in the condemnation proceedings, which was caused by suits in the federal court to enforce compliance with federal law, should not work a penalty on the owners by denying them the appreciated value of their property. *Friberg*, 687 P.2d at 835. In part II of the *Friberg* opinion, Justice Stewart, joined by Justice Durham, stated:

We are, of course, constrained to construe § 78–34–11 within the limitations of constitutional requirements. When valuation is fixed at a date prior to the actual taking and the value of the property increases during a prolonged condemnation proceeding so that the valuation does not reflect a fair valuation of the property and does not therefore constitute "just compensation," the statute fixing the time of valuation is unconstitutional as applied.

*Id.* at 829. Justice Oaks, concurring specially, disagreed with the necessity of a constitutional discussion in part II, but nevertheless concluded that the date of valuation was the later date.

In the instant case, ordinance 81–1 was effective immediately upon posting on September 24, 1981. Subsequent ordinances, all to protect Cornish's culinary water supply, were enacted in succeeding years through 1988. Upon the passage of each new ordinance, the prior ordinance was repealed. There is no evidence in the record that Cornish enforced any of these ordinances against Kollers prior to 1985. Evan Koller was contacted directly by letter dated June 11, 1985, and notified that he must comply with all terms of ordinance 85–1. However, not until July 29, 1986, was a summons and complaint in condemnation served on Kollers and the motion for an order of immediate occupancy filed with the court.

Kollers point to numerous restrictions put upon their use of the land under each of the ordinances. They argue that the value of the property in 1981 was significantly greater than its value in 1986, because Cornish first devalued the property by regulatory restrictions and then five years later commenced this condemnation action. This contention is without merit. Despite Kollers' argument, ordinance 81–1 and the succeeding ordinances had little, if any, effect on Kollers until the service of summons.

2. The appellant was unable to rebuild Lutherglen, a retreat center and recreational area for

At trial, the court permitted Evan Koller to testify that crop production declined during the post-ordinance years but before the service of summons. He also testified that there had been times when the Pearson and Griffiths zones yielded as much as 100 bushels of wheat per acre, but this required application of 200–plus pounds per acre of nitrogen, which he was prohibited from doing. Nevertheless, Koller admitted that he continued to fertilize with nitrogen in the Pearson and Griffiths protection areas from 1981 to 1986, with the exception of 1982, when he applied none. In fact, Kollers' appraiser testified that their farm had one of the highest agricultural yields in Utah during that five-year period.

Kollers rely on *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), to support their claim that they are entitled to be compensated based on the September 1981 value of the property. *First English* involved a "temporary regulatory taking" in which a subsequently invalidated county ordinance deprived a property owner of *all* uses of his land.[2] The court held that the landowner was entitled to compensation for the taking in that interim period of years before invalidation. 482 U.S. at 319, 107 S.Ct. at 2388, 96 L.Ed.2d at 266–67. The Court stated:

We merely hold that where the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective.

We also point out that the allegation of the complaint which we treat as true for purposes of our decision was that the ordinance in question denied appellant all use of its property.

482 U.S. at 321, 107 S.Ct. at 2389, 96 L.Ed.2d at 268.

That case can easily be distinguished. Although Kollers point to ordinance 81–1, which authorized the town to

handicapped children.

restrict their use of their property, they continued their farming practices—albeit in apparent violation of that ordinance. Even a "temporary" regulatory taking would require a denial of "all uses" of their property. *First English*, 482 U.S. at 318, 107 S.Ct. at 2387, 96 L.Ed.2d at 265–66. We agree with the trial court that such a denial did not occur here.

Kollers also rely on *Nollan v. California Coastal Commission*, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), to argue that ordinance 81–1 amounted to a taking in denial of all beneficial and economically viable use of 85 percent of their total property and decreased the value of their property by 85–90 percent. *Nollan* is unsupportive of that argument because the majority opinion did not address whether the ordinance denied the owners any economically viable uses of their land. 483 U.S. at 841–42, 107 S.Ct. at 3151, 97 L.Ed.2d at 691–93.

■ In other case law on the subject, for there to be a taking under a zoning ordinance, the landowner must show that he has been deprived of all reasonable uses of his land. *See C.F. Lytle Co. v. Clark*, 491 F.2d 834, 838 (10th Cir.1974). For example, almost all zoning decisions have some economic impact on property values. However, mere diminution in property value is insufficient to meet the burden of demonstrating a taking by regulation. *See Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Hadacheck v. Los Angeles*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915).

### III

■ Kollers next contend that the value of zeolite deposits allegedly underlying 94 acres should have been considered by the jury in determining just compensation. Their counsel proffered evidence of the deposits and that they had an estimated value of $38 million. The trial court denied Kollers the right to present this evidence to the jury, opining that the evidence was speculative inasmuch as there had been no

extraction of minerals to that date. However, the judge commented that Kollers retained the right to extract any minerals and, should that right ever be denied them because of the perpetual easement taken by Cornish, they would have the right to return to court to seek further damages.

■ As a general rule in this country, the existence of mineral deposits in or on land is an element to be considered in determining the market value of such land. 4 J. Sackman & P. Rohan, *Nichols' The Law of Eminent Domain* § 13.22, at 13–119 (3d ed. 1990); *see also State v. Noble*, 6 Utah 2d 40, 44, 305 P.2d 495, 499 (1957) (it is proper to admit evidence that the land contains valuable mineral deposits). Utah Code Ann. § 78–34–2 provides special protection to a landowner whose land containing valuable minerals is condemned:

The following is a classification of the estates and rights in lands subject to being taken for public use:

(1) a fee simple, when taken for public buildings or grounds or for permanent buildings, for reservoirs and dams and permanent flooding occasioned thereby, or for an outlet for a flow, or a place for the deposit of debris or tailings of a mine, mill, smelter or other place for the reduction of ores, or for solar evaporation ponds and other facilities for the recovery of minerals in solution; provided that where *surface ground is underlaid with minerals, coal or other deposits sufficiently valuable to justify extraction, only a perpetual easement may be taken over the surface ground over such deposits.*

(Italics added.) Thus, only a perpetual easement may be taken over the surface when it is underlaid with minerals "sufficiently valuable to justify extraction." In those instances, the landowner retains the rights to the underlaid minerals which the condemning agency has not sought or cannot afford to buy, and the landowner is entitled to later recover those minerals. However, where the landowner will be unable to later remove the mineral deposits because the operation of the condemnor impedes their removal, the value of the

minerals left in place should be considered in determining the compensation to which the owner is entitled. 4 J. Sackman & P. Rohan, *Nichols' The Law of Eminent Domain* § 13.22[1], at 13–144 (3d ed. 1990). In *Lomax v. Henderson*, 559 S.W.2d 466, 467 (Tex.Ct.App.1977), evidence was admitted on the diminution of the mineral owner's estate due to the taking of an easement which restricted the recovery of oil and gas on the condemned land. The court stated Texas law to be that "the ownership of minerals in place carries with it, as a necessary appurtenance thereto, the right to reasonably use so much of the surface as may be necessary to enforce and enjoy the mineral estate." *Id.* The proper measure of loss of use of the surface of the land in question is the diminution in value of the landowner's mineral estate by the taking.

The trial court denied the admission of evidence of minerals because of the speculative nature of Kollers' counsel's offer of proof. Portions of the trial transcript show the discussion between counsel and the court on this issue:

> Mr. Preston [Kollers' counsel]: If the court feels this is speculative, let me redefine our offer of proof. We're going to prove that we've drilled test holes in this property under the protection zone and the test holes go down through the topsoil, go into bentonite soil which holds water, as the court well knows and then it goes into the zeolite in the bottom. Everything is wet all the way down to the bentonite because it holds the water. When you hit the zeolite, all of a sudden it's dry powdery just like the rock we've shown here. We drilled five holes in the subject property in the Pearson Spring area. In every case the hard rock surface underneath was hit indicating that there is in fact throughout this area the zeolite that has been mentioned.
>
> We have taken samples and we have had the samples tested and the samples show that they are of commercial quality where they have been selected in the protection zone.
>
> . . . .

> Mr. Fisher [Kollers' co-counsel]: When the mine can't be built because the surface will be destroyed by the taking, then you must compensate for the mineral.
>
> The Court: But how do you know you must compensate him for mineral until you know whether it's going to do something to their rights?
>
> Mr. Fisher: Because he has told me I cannot enter the property except the three locations that are shown on that map. He told me that himself, the mayor on the stand yesterday. I cannot enter the property except at those three locations.
>
> The Court: I think it's a question to be decided if and whenever this should come up. I don't see any of us will in our lifetime ever see any bulldozer or anything out there.
>
> Mr. Fisher: I beg to differ, your Honor. I've already had two.
>
> The Court: That's my opinion.
>
> Mr. Fisher: We've already had two mineral companies approach us to mine that product after they have known of the quality of the product that's there, two of them.
>
> The Court: Okay. I'll believe it when I see it.

The trial court noted but distinguished *William Russell Coal Co. v. Board of County Commissioners*, 129 Colo. 330, 270 P.2d 772, 775 (1954), where condemnation of an easement across realty underlaid with coal was sought. Removal of the coal would allegedly impair support of the surface. The court held that the amount of damages sustained by the owner because coal was left in place was a question for a jury or a commission to determine, and the trial court had erred in refusing to admit such evidence. The trial court in the instant case distinguished *William Russell Coal Co.* because the extraction there was ongoing, whereas no extraction had yet occurred on Kollers' property. Such a distinction is unhelpful in light of *Montana Railway Co. v. Warren*, 137 U.S. 348, 352–53, 11 S.Ct. 96, 98, 34 L.Ed. 681, 683 (1890), in which the Court held that evidence of "in place" minerals is admissible to determine

land value. The Court commented as follows with regard to a claim that the existence of minerals was "speculative":

> Until there has been full exploiting of the vein its value is not certain, and there is an element of speculation, it must be conceded, in any estimate thereof. And yet, uncertain and speculative as it is, such "prospect" has a market value; and the absence of certainty is not a matter of which the Railroad Company can take advantage, when it seeks to enforce a sale. Contiguous to a valuable mine, with indications that the vein within such mine extends into this claim, the Railroad Company may not plead the uncertainty in respect to such extension as a ground for refusing to pay the full value which it has acquired in the market by reason of its surroundings and possibilities.

137 U.S. at 352–53, 11 S.Ct. at 98, 34 L.Ed. at 683.

This authority was recently noted with approval in *Asarco Inc. v. Kadish*, 490 U.S. 605, 628 n. 3, 109 S.Ct. 2037, 2051 n. 3, 104 L.Ed.2d 696, 722 n. 3 (1989). The Tenth Circuit has also held that expert testimony regarding in-place minerals, limestone preserves, although speculative, was clearly admissible. *United States v. 179.26 Acres of Land in Douglas County, Kansas*, 644 F.2d 367, 372–73 (10th Cir.1981).

It follows from what we have written that the trial court erred in refusing to admit evidence of the existence of the zeolite deposits and their enhancement of the value of the land sought to be condemned without first determining whether the deposits could be removed later by Kollers without being impeded by the existence of the easement taken. The trial court should have determined that question at the time of trial rather than requiring Kollers to litigate it later, if and when they attempt to remove any of the deposits. The record before us does not contain any evidence as to the methods employed in mining zeolite or whether the mining would interfere with the utility of the protection zones. The case therefore must be remanded to the trial court for a new trial on the issue of damages if the trial judge preliminarily determines that the existence of the easement taken by Cornish will either totally prevent or enhance the cost of removing the zeolite. The jury will then consider, in fixing Kollers' damages, the existence of the mineral deposits. If the trial court finds that the zeolite may be mined and removed without being prevented or impeded by the easement, a new trial on the issue of damages will be unnecessary.

However, preliminary to the determination of the question discussed above and a new trial, if necessary, the trial court should determine whether the existing water rights held by Cornish prohibit the extraction of minerals claimed by Kollers in the area of the protection zones. Both parties recognize the existence of the legal question of whether Kollers can, in any event, extract minerals from their land if in doing so it would destroy or diminish the water rights to the springs owned by Cornish. This question will need to be resolved before Kollers can establish an entitlement to extract the zeolite.

### IV

When the trial commenced, Cornish moved to amend its complaint to seek only a perpetual easement over the one hundred acres instead of a fee simple estate therein. Cornish asserts that it was prompted to do so because it only then learned that Kollers intended to claim that their land was underlaid with valuable mineral deposits. In view of that claim, Cornish decided that it was obligated under section 78–34–2(1), set out above, to seek only a perpetual easement. The motion to amend was granted by the trial court, and in the final order of condemnation, Cornish acquired only a perpetual easement. Kollers contended in the trial court that by amending its complaint, Cornish had abandoned the condemnation and that under section 78–34–16, they were entitled to an award of attorney fees, expenses, and costs. The trial court denied that relief.

Utah Code Ann. § 78–34–16 provides for a condemnee's recovery of all damages sustained and reasonable and necessary expenses incurred when the condemnor aban-

dons the proceedings and causes the action to be dismissed without prejudice:

> Condemnor, whether a public or private body, may, at any time prior to final payment of compensation and damages awarded the defendant by the court or jury, *abandon the proceedings and cause the action to be dismissed without prejudice,* provided, however, that as a condition of dismissal condemnor first compensate condemnee for all damages he has sustained and also reimburse him in full for all reasonable and necessary expenses actually incurred by condemnee because of the filing of the action by condemnor, including attorneys fees.

(Italics added.) We applied this statute in *Provo City Corp. v. Cropper,* 28 Utah 2d 1, 497 P.2d 629 (1972), where the condemning agency withdrew and dismissed its condemnation action before trial because the land as appraised was too expensive to acquire. The plaintiff advised the court that the defendant's property was no longer needed for public use. Consequently, the case was stricken from the trial calender, and the court made and entered an order dismissing the action without prejudice. The defendants were awarded expenses and attorney fees. This court held that the statute was controlling, and upon abandonment *and* dismissal of the action to avoid a trial, the condemnee was entitled to recover expenses and attorney fees. 28 Utah 2d at 3, 497 P.2d at 630.

In contrast, Cornish proceeded with its acquisition and did not move for dismissal of the condemnation proceedings. We interpret the statute as providing for payment of costs and fees only when the condemnation is totally abandoned *and* dismissed prior to a conclusion. Although the statute is quite liberal in covering every conceivable expense, damage, and cost in order to protect owners of private property from an unfair burden when the condemnor elects to abandon the action,[3] an actual abandonment *and* dismissal must first occur. Although the case authority from other jurisdictions cited by the Kollers allows

recovery of attorney fees and expenses for partial abandonment or for abandonment in the absence of a dismissal, those cases are inapplicable here because the statutory framework in Utah is different from those jurisdictions cited.

V

 Kollers contend that they should have been permitted to introduce evidence of the value of hunting access permits in the determination of the value of the highest and best use of their property. Cornish responds that Kollers were permitted to present extensive evidence regarding the wildlife potential of the property, including evidence that the deer herd on the property added to its total value and was a factor to be considered in determining fair market value.

 We find no abuse of discretion. The trial court excluded only evidence which compared the business potential for hunting permits on Kollers' property with Deseret Land and Livestock's use of hunting permits on its property.[4] That exclusion was proper. *See State ex rel. Road Comm'n v. Larkin,* 27 Utah 2d 295, 299, 495 P.2d 817, 820 (1972) (court properly excluded evidence of sales of allegedly comparable property located on other interchanges of interstate highways because of dissimilarities in the properties). Cornish's counsel also objected to the presentation of Kollers' evidence as a disguised lost profits claim. *See State v. Noble,* 6 Utah 2d 40, 44, 305 P.2d 495, 498 (1957) (courts have rejected with great unanimity the proposition that just compensation is the equivalent of the total profits which would be realized from the future operations of the property; proper measure is the market value of property and not output thereof); *State v. Ouzounian,* 26 Utah 2d 442, 449, 491 P.2d 1093, 1095 (1971) (business profits are not subject of independent compensation aside and apart from market value of land on which business has been conducted). Kollers are not entitled to a valuation

---

3. Note, *The Condemnor's Liability for Damages Arising Through Instituting, Litigating or Abandoning Eminent Domain Proceedings,* 1967 Utah L.Rev. 548, 560.

4. Deseret Land & Livestock is located in Rich, Morgan, Weber, and Summit Counties in Utah and in western Wyoming, covering 200,000 acres.

of the use of the property for hunting access permits independently, as a separate calculation, of the land of which it is a part. The land was properly valued giving the wildlife resource due consideration as a component part of the land.

## VI

Finally, Kollers contend that they should have been awarded costs of $2,252 for preparation and presentation of photographic maps, graphic exhibits, and transcripts of pretrial hearings that were used at trial. The court awarded Kollers only $74 in taxable costs for the jury fee and a witness fee. We find no error. In *Frampton v. Wilson*, 605 P.2d 771, 774 (Utah 1980), we held that expenses for a model, photographs, and certified copies of documents which were necessary for litigation were not properly taxable as costs. Costs were defined by the court as "those fees which are required to be paid to the court and to witnesses, and for which the statutes authorize to be included in the judgment." *Id.*; Utah R.Civ.P. 54(d)(1); Utah Code Ann. § 21–5–8. Kollers argue that in *Frampton* we approved the costs of depositions in the taxing of costs and that the costs of transcripts of pretrial hearings should be similarly treated. In that case, however, this court warned that the taxing of costs of depositions is subject to limitations, i.e., depositions must be taken in good faith and essential for the development and presentation of the case. *Frampton*, 605 P.2d at 774. Further, the fact that we approved the taxing of deposition costs "was not intended and should not be taken as opening the door to other expenses." *Id.* The trial court may exercise reasonable discretion in awarding taxable costs, and we conclude that no abuse of discretion has been shown here.

This case is remanded to the trial court for further proceedings consistent with this opinion.

HALL, C.J., and STEWART, DURHAM and ZIMMERMAN, JJ., concur.